**The WURLITZER COMPANY**
v.
**ELECTROKEY, INC., et al.**
No. CA3–4803–C.

United States District Court,
N. D. Texas,
Dallas Division.

Aug. 23, 1974.

D. Carl Richards, Richards, Harris & Medlock, Dallas, Tex., and Richard R. Trexler, and Robert M. Wolters, Olson, Trexler, Wolters, Bushnell & Fosse, Ltd., Chicago, Ill., for plaintiff.

Wm. T. Wofford, Wofford, Felsman & Fails, Forth Worth, Tex., Marvin A. Henrickson, Hill, Sherman, Meroni, Gross & Simpson, Chicago, Ill., for defendants.

## OPINION

WILLIAM M. TAYLOR, Jr., Chief Judge.

This is a patent infringement case brought under 28 U.S.C. § 1338 and 35 U.S.C. § 281.

Plaintiff is a Delaware corporation with its principal place of business in Illinois. Defendants Electrokey and Rhythm Band have their principal place of business in the Northern District of Texas. Defendant Moore is a resident of the Northern District of Texas. Defendant Chicago Musical Instrument is a resident of Illinois and was a party to a suit filed there by Plaintiff that was subsequently dismissed upon Chicago Musical Instrument's addition into this suit. Defendant Nippon Columbia is a Japanese corporation which was served through its agent, Defendant Moore.

The broad question here is whether the electronic piano manufactured and distributed by the Defendants infringes four patents owned by Plaintiff.

The first patent is B. F. Miessner No. 3,038,363 originally filed June 22, 1952, and patented June 12, 1962. Plaintiff contends that Defendants' device infringes claims 3, 4, 5, 6, 7, 8 and 9 of that patent.[1]

The second patent is B. F. Miessner No. 2,942,512, filed August 14, 1957, and patented June 28, 1960. Claims 1, 2, 6 and 9 are claimed to be infringed.

Plaintiff's third patent in dispute is C. W. Andersen No. 2,949,053, filed June 1, 1954, and patented August 16, 1960. Claims 1–5 are in dispute.

These first three patents involve the construction of tone generators for electronic pianos. Defendants do not contest their validity but claim that when they are construed in the light of the prior art, they do not read on Defendants' piano.[2]

The fourth patent in suit is H. E. W. Bode No. 3,154,997, filed October 3, 1962, and patented November 3, 1964. All six claims are said to be infringed in Plaintiff's view and invalid in Defendants' view. This patent pertains to musical instrument reeds with an inward curved taper extending from the base.

## I.

First, a word on the devices in dispute. Any piano, acoustic or electronic, has three essential parts. First is the action. That is the portion consisting of the keys, the hammers, the dampers and the interconnecting bits and pieces. Next is the tone generator. In an acoustic piano, it is comprised of the strings and their tightening mechanisms. In an electronic piano, at least of the type in dispute, it is comprised of a set of flat metal reeds fixed on one end and with the other end free to vibrate and a lead weight attached to the free end. It also has some means with which to sense the vibrations of the reed. The third part is an amplification device. It is the sounding board and case of an acoustic piano. Our electronic pianos have electronic amplifiers and loudspeakers connected to the sensory pick-ups instead.

There are two or three principal advantages to an electronic piano. In the

---

1. The claims of the four patents in dispute are set out in Appendix "A" to this opinion. For the Supreme Court's view of the law of patent cases since the last major change in the patent statutes see the following cases which the Court has used for its principal guidance: Graham et al. v. John Deere Co. of Kansas City et al., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); United States v. Adams et al., 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966); Anderson's Black Rock, Inc. v. Salvage Co., Inc., 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969).

2. Defendants have made many contentions, but at final argument they narrowed their contentions to those discussed here.

They also stated their contentions in the converse. They contend that if the first three patents are construed broad enough to include their structure, they are invalid as they would also include the prior art. This opinion will speak in terms of the first way of stating Defendants' contentions but the second has not been ignored.

first place, it has a tremendous weight saving advantage. The sound board in an acoustic piano must be extraordinarily strong as it must withstand tensions of up to 18 tons, as in the case of large grands. The weights of acoustic pianos therefore go as high as 1,500 pounds. This is in contrast to some models of Plaintiff's manufacture that have weights as low as 60 pounds.

Another big advantage is the ability of an electronic piano to stay in tune. String pianos must be constantly retuned in order to be musically correct and pleasing to the ear. The reeds in an electronic piano do not require frequent retuning. This is a significant saving in both time and bother.

A third major advantage of an electronic piano is its ability to be used with closed circuit devices such as headphones and teaching consoles. The pupils can then be given group instruction or separate instruction at the same session at the discretion of the teacher. Whether they hear only themselves or the whole group or only the teacher can be controlled by the teacher. Headphones also allow the pupil to practice without disturbing others.

Other advantages are portability, low incidence of reed failure and possibly lower purchase price.

## II.

Defendant Nippon Columbia manufactures the purportedly infringing pianos in Japan and exports them to our country. Electrokey and Rhythm Band are the importers of them. Rhythm Band sells Nippon Columbia's pianos under the name "Electrokey" directly to schools for educational purposes. Electrokey sells them to Chicago Musical Instrument under the name "Maestro". Chicago Musical Instrument then wholesales them to local music dealers for retail sale to mainly the educational market. The parties agree that the two brands of Nippon Columbia built pianos have no differences material to this case. Also no questions of jurisdiction and venue have been raised. The Court finds jurisdiction is proper in this District after an independent evaluation.

## III.

■ The first patent shall be referred to as the Miessner '363 patent.[3] Defendants say that their pianos do not infringe this patent because their tone generators do not contain "a single pick-up element for electrostatically sensing vibrations of a multiplicity of said reeds", an element of each of the claims of this patent that are in dispute. This position is untenable.

Defendants' pick-up is composed of many small parts which are screwed together and to a large stable plate. Their contention is, in effect, that in order for their structure to infringe this patent, it would have to be made of one solid piece. This is a misreading of the disclosure. The full pertinent language of the claims is "a single pickup element for electrostatically sensing vibrations of a multiplicity of said reeds, said pick-up element having a plurality of electrically conductive portions thereof . . ." This language discloses two things when taken in conjunction with the drawings and description contained in the patent. This is not to say that the drawings and description must be looked at in order to make sense of the claims, but that they do show that Defendants' reading of the claims is incorrect.

The first thing disclosed by this language is that it is desirable to have a solid base for various reasons and second, that it may have screws, arms, etc. attached to it which are the parts in close proximity to the reeds and act as the sensing surfaces. This is the apt

---

3. This notation using the three last digits of the patent number will be used throughout this opinion.

Also, the long and varied histories of these patents in the patent office will not be discussed in view of the findings and conclusions of the Court made herein.

reading of this language of the claims and a description of Defendants' structure.

Defendants' view only takes into account the mechanical aspects of this disclosure. The mechanical aspect of the solid base is the more important part of the disclosure as to the base. But the whole pickup assembly is integrated into one electrical circuit which is the important aspect of the whole assembly. This integration produces the cumulative capacitance disclosed in another part of the claims as part of the invention.

Each of the claims beyond No. 3 contains at least one new element. Defendants have put strained interpretations on such terms as coplanar in order to be able to contend that these new phases do not apply to their structure. The Court refuses to put such attenuated interpretations on these words and phrases. A view of the pianos in question, the models, booklets, technical manuals and testimony entered into evidence show that when the new phrases of the claims are given a reasonable and rational interpretation, each of the elements as claimed in claims 3–9 of the Miessner '363 patents are present in Defendants' structure in a form contemplated by the claims.

### IV.

The second patent is another Miessner patent which will be referred to as the '512 patent. Defendants say that their piano does not infringe this patent when it is construed in the light of prior art.

Defendants have made much of the claims saying musical instrument and not piano. But the patent is clearly entitled "Electronic Piano" and the description sets out the principal object of the invention to be the production of pianistic tones from an electronic musical instrument. There can be no mistake that the device disclosed pertains to an electronic piano.

Defendants cite a Zuck patent, No. 2,542,611 for disclosing a pick-up that is alongside an edge portion of the reeds. This citation, though, is an organ patent and of no relevance to the construction of an electronic piano. Electronic organ reeds are vibrated by the passage of a volume of air over them. Therefore, their vibrational characteristics are far different from those of an electronic piano. A wind driven reed vibrates symetrically and produces a constant tone. A hammered reed has a much more complex vibration with a large initial tone that rapidly decays. The characteristics are so different that for these purposes the disclosures of the Zuck patent are of little value to an electronic piano constructor. Therefore it is not relevant prior art in this proceeding.

Defendant also cites some testimony from Mr. C. W. Andersen who was Plaintiff's Manager of Corporate Engineering for Electronic Pianos. His offhand testimony given at his deposition some years after the patent was granted was to the effect that it was obvious to surround the end of a reed with a pickup in order to achieve a greater volume. This is undoubtedly true. But Miessner's '512 disclosure is much more particularized and calculated to achieve more effects than just a greater volume.

The disclosure of ". . . an electric translation pickup adjacent the reed, said pick-up having a tone producing portion located alongside and being vibratorily passed by a longitudinally intermediate edge portion of the reed . . ." is a way of minimizing what is called dynamic shortening. As a reed is struck by a hammer, the portion struck travels in the direction of the hammer strike faster than the rest of the reed and as a result has the effect of pulling the end of the reed away from the pickup. This pulling away from the pick-up results in a large amplitude change that continues in time past the initial striking of the reed where in an acoustic piano, the amplitude is rapidly decreasing. A pick-up such as disclosed in Miessner '512 acts in relationship to a portion of the reed which is not dynamically shortened. This minimizes the ef-

fects of the shortening in relation to the total effect of the reed on the pick-up.[4]

In claim six of the Miessner '512 patent, Defendants have attacked the portion ". . . means comprised in said mechanical system for at least substantially eliminating from the free vibration of the reed a lower one of its normally present upper partials . . ." Mr. Conner, Defendants' technical expert said that this may be inconsequential from a musical standpoint. This statement alone is not of much weight, particularly in light of Plaintiff's thorough explanation of the interaction of the various elements of the claims.

The Court finds that Defendants' structure when the Miessner '512 patent is properly construed does infringe upon each of the contested claims.

## V.

■ Defendants do not contest the validity of the third patent in suit which will be referred to as the Andersen '053 patent. They again allege that their structure does not infringe the claims in dispute. The Court agrees.

Mr. Andersen's patent is concerned with producing a specific structure that is economically feasible to produce in the United States. The disclosure of this patent adds one element in substance over the two previous Miessner patents, the '363 and the '512, that have been discussed. This is a solid comb-like pick-up structure.

The United States is a capital intensive country. An inventor in this setting will be trying to come up with a structure that can be built in simple operations by machinery whenever possi-

ble. This is the substance of Mr. Andersen's invention. He contemplated a pick-up structure made of a solid piece of plastic, coated with a metal in order to have an electrode. Contrary to the disclosure of the Miessner '363 patent, his concern was not with the electrical properties of his device, particularly as they had been disclosed in the Miessner patents. He was concerned with the mechanical structure and its ease of construction in a capital intensive economy.

Nippon Columbia's designers were trying to come up with a structure economically producible in Japan. As pointed out by the Japanese witnesses of the Defendants, Plaintiff's structure would not be economically producible in Japan. Japan is labor intensive and not capital intensive. It is cheaper for Japanese industry to have many workers assembling small parts than it is to have one or two large machines stamp out a large plastic part and coat it with metal. Defendants' pick-up structure is comprised of many small parts that are assembled and adjusted by hand and not a monolithic structure.

■ The doctrine of equivalents does not apply in this instance. It would apply as to the two Miessner patents in suit, if, it were necessary to invoke it. Those patents are far broader than the Andersen '053 patent as they are basic to the electronic piano division of the electronic musical instrument field. But the Andersen '053 patent must be substantially construed to the structure described and depicted in the patent to keep the claims from running afoul of the Miessner patents. The range of equivalents available to Plaintiff in any event would not include the structure

---

4. Mr. Conner, Defendants' technical expert of fine academic qualifications, based his opinion as to this patent on experiments conducted on an apparatus entered into evidence as Defendants' Trial Exhibit 11. The reed used in this apparatus is quite a crude one. It consists of a flat piece of steel about six inches long. Though it might be excellent for theoretical experiments, Mr. Connor never correlated it or his tests to any of the mechanisms put before the Court in the disclosures of the patents or any workable musical structures. Mr. Conner deflected his reed in some undisclosed manner but not by striking it with a hammer as in the Miessner '512 patent. He said that he was not concerned about the differences in methods of excitation of the reed. That method is a major factor in an electronic piano according to the rest of the evidence presented.

produced and sold by the Defendants. The Court finds no infringement of the Andersen '053 patent.

## VI.

 Defendants do attack the validity of the fourth patent in issue, the Bode '997 patent. The Court agrees that this patent is invalid.

There is little difference between the Bode '997 patent and a Radtke et al patent No. 2,309,714. Bode discloses a longer taper of fillets leading out from the base of musical instrument reeds than Plaintiff claims is disclosed by Radtke. Also Plaintiff claims a non-circular arcuate curve in the fillets.

Defendants also attack the Bode '997 patent for not meeting the requirements of 35 U.S.C. § 112 as to requisite specificity in the disclosures of the claims. This is the key to the answer to our problem.

Defendants have shown that as early as April, 1934, methods were known how to minimize stress in fillets. An article published in *Project Engineering* of that date (p. 133) gives proper formulas with which to compute stress in fillets. This is what is left out of the Bode '997 claims as being empirical. This shows the Bode '997 disclosure to be less sophisticated than the knowledge that had been published 32 years before the patent application was filed.

Mr. Bode's claims were allowed as an improvement over the Radtke patent teachings. The only differences being the increase in the curve of the fillets and an arcuate curve.

This presents the question of whether the Bode disclosure is of a patentable type? Clearly, no. The *Product Engineering* publication demonstrated the empirical mathematical method used in finding the ideal curve of fillets in general six years before the Radtke patent was applied for. Mr. Bode's discovery is shown by this publication to be of a type not patentable for being the empirical procedure used to maximize the benefits of the Radtke teachings. Radtke is not

limited to any certain curve in the fillets. By saying that the curve of the fillets should be longer but not too long and noncircular, one is really saying in far less sophisticated terminology, that one should use the formulas disclosed in the 1934 publication to determine just what curve to use to insure a long life for the reeds. In sum, Mr. Bode stated nothing new. The Court concludes that the Bode '997 patent is invalid.

## VII.

Having found infringement of the Miessner '363 and '512 patents, the question of relief is raised. Plaintiff has prayed for an injunction against further infringement, an accounting for general compensatory damages, that such damages be trebled, punitive and exemplary damages, assessment of costs against Defendants and reasonable attorneys' fees.

Clearly Plaintiff is entitled to an injunction restraining infringement of the two Miessner patents and the accounting for general compensation purposes. Costs will be taxed against the Defendants by the Clerk upon the entry of a judgment that disposes of all claims, interests and parties.

The extraordinary remedies of treble, punitive and exemplary damages and attorneys' fees are more difficult matters.

 35 U.S.C. § 285 allows attorneys' fees in only exceptional cases. The Court is of the opinion that this is not an exceptional case in that Defendants have not been vexatious and in view of the varied findings and conclusions of the Court as to infringement and invalidity. No attorneys' fees are therefore awarded.

Plaintiff's prayer for treble, punitive and exemplary damages appears to have a redundancy in it. The latter two types of damages are a part of the first. The actual question of increasing damages up to three times the amount found should not and will not be addressed un-

til after the accounting is made.[5] But the predicate for increased damages is a proper inquiry at this time.

■ The standard for laying a predicate is knowing, willful, intentional or deliberate infringement as it may be variously stated.[6]

Defendant Nippon Columbia engaged in negotiations with Plaintiff as to the trade secret knowledge of Plaintiff and Plaintiff's patents in the electronic piano field in 1963 and 1964. This exchange of correspondence was quite extensive. In one letter, dated February 29, 1964 (Plaintiff's Exhibit 15–Y), Mr. Seya, President of Nippon Columbia, stated that he was familiar with all of Plaintiff's patents registered in the United States. Nippon Columbia continually sought to get information as to pending patent applications before any agreement was reached as to licensing.

The developer of Defendants' tone generator, Mr. Takamatsu, testified that Nippon Columbia purchased one of Plaintiff's pianos in February, 1963. He also said that he was familiar with the results of Nippon Columbia's investigation of Plaintiff's electronic piano when he designed the structure that is claimed to be infringing. Nippon Columbia had sold a string electronic piano and a reed electronic piano in turn without as much success as desired when it redesigned the reed piano in the period from March 1965 to February 1966. Mr. Takamatsu testified that he referred to the Wurlitzer piano in general but not to any particular feature while redesigning the tone generator of Defendants' piano. He testified further that he made a modification with the intent of avoiding an infringement of the Andersen '053 patent.

Mr. Takamatsu's redesign came after the licensing negotiations, the purchase of one of Plaintiff's pianos and the issuance of the four patents in suit.

Mr. Andersen testified that the electronic pianos of Plaintiff and Defendants were so much alike that the employees in Wurlitzer's laboratory were able to plug the pick-up of one of their pianos into one of Defendants' pianos and play the two together. A simple visual comparison of the sets of reeds from the two pianos shows them to have relation to the Andersen '502 patent size of the mounting hold. The main difference between the two pianos appears to be the difference discussed in relation to the Andersen '053 patent above.

The evidence clearly shows that Nippon Columbia knew of the Wurlitzer patents in question and designed their structure with Plaintiff's structure in mind. Its infringement can be termed nothing other than willful and deliberate. A predicate has been laid for increased damages which will be considered after the accounting by Defendants. Also the question of just whom increased damages may be awarded against in our factual situation will be inquired into at that time. The parties are requested to submit briefs on the liabilities of the respective Defendants if they believe them necessary in light of the indemnification agreement running in favor of the American Defendants.

## APPENDIX A

### B. F. MIESSNER #3,038,363

3. In an electronic piano, the combination comprising a plurality of juxtaposed tuned reeds each of which cantilevers from a supported end thereof to a free end thereof, key controlled hammer means for impulsively exciting said respective reeds for vibration, a single pickup element for electrostatically sensing vibrations of a multiplicity of

---

5. Anchor Hocking Glass Corp. v. White Cap. Co., 47 F.Supp. 451 (D.C., D.Del.1942) ; McCulloch Motors Corp. v. Oregon Saw Chain Corp., 245 F.Supp. 851 (D.C., S.D. Cal.1965).

6. See American Safety Table Co. v. Schreiber, 415 F.2d 373 (2d Cir., 1969), cert. den., 396 U.S. 1038, 90 S.Ct. 683, 24 L.Ed.2d 682, for example.

said reeds, said pick-up element having a plurality of electrically conductive portions thereof disposed in proximate relation to the free ends of said respective reeds of said multiplicity to provide electrical capacitance between said pick-up element and each reed which is varied by impulse induced vibration of the reed relative to the pick-up element means, for applying a direct current potential between said pick-up element and all of said multiplicity of reeds to charge said reeds to a uniform voltage with respect to said pick-up element, and electronic tone signal means connected to said pick-up element to produce electronic tone signals corresponding to the changing cumulative capacitance between said pick-up element and said multiplicity of reeds coacting therewith.

4. In an electronic piano, the combination comprising a multiplicity of tuned reeds mounted alongside each other in a manner such that each reed cantilevers from a supported end thereof to a free end thereof, key controlled striking means coacting with each of said respective reeds to impulsively excite the reed to vibrate freely in a manner which swings the free end of the reed to opposite sides of a rest position thereof, a single electrostatic pick-up conductor having portions thereof disposed in adjacent relation to the free ends of said respective reeds, each of said pick-up conductor portions registering with the normal position of the coacting reed and being shaped and positioned to extend away from a position of alignment with the normal position of the reed in only one of the two directions in which the reed swings away from its normal position, means for charging all of said multiplicity of reeds to a uniform potential with respect to said pick-up conductor, and electronic tone signal means coacting with said pick-up conductor to produce tone signals controlled by the cumulative capacitance between said conductor and said multiplicity of reeds coacting therewith.

5. An electronic piano comprising a plurality of electrically conductive reeds disposed in side by side coplanar relation to each other and being of progressively varying length, each of said reeds being fixedly mounted at one end and free at its other end, a plurality of hammers one for each reed selectively operable for impulsively exciting the reeds into decadent free vibration, keys for operating the hammers, an electrostatic pick-up comprising a plurality of pick-up portions disposed in side by side coplanar disposition to each other and in a proximate electrically capacitive relation to the projecting portions of said respective reeds, said respective pick-up portions being substantially flush with the normal positions of the respective reeds and extending along the swing of the reeds in only one direction of reed movement away from the normal positions of the reeds, the extent of each pick-up portion in said one direction covering substantially the full excursion of the coacting reed in said one direction, means for charging said pick-up to a substantial electrical potential relative to the coacting reeds, and electronic tone signal means coacting with said pick-up and said reeds to produce tone signals controlled by the electrical capacitance between said pick-up and said reeds.

6. In an electronic piano, the combination comprising a plurality of juxtaposed tuned reeds each of which cantilevers from a supported end thereof to a free end thereof, key controlled striking means for impulsively exciting said respective reeds for vibration, a pick-up for electrostatically sensing vibrations of said reeds, said pick-up including a plurality of electrically conductive portions thereof disposed alongside the vibratory paths of said respective reeds in proximate relation to the normal positions of the respective reeds, to provide electrical capacitance between said pick-up element and each reed which is varied by impulse induced vibration of the reed relative to the pick-up element, means for applying an electric potential between said pick-up and said reeds to charge said reeds to a substantial voltage with respect to said electrically conductive portions of said pick-up, and

electronic tone signal means coacting with said pick-up and said reeds to produce electronic tone signals controlled by the instantaneous capacitance between said pick-up and said reeds coacting therewith.

7. An electronic piano as defined in claim 6 in which each of said electrically conductive portions of said pick-up element traverses the free end of the coacting reed and has a width with respect to the reed which substantially exceeds the corresponding transverse width of the coacting reed.

8. In an electronic piano, the combination comprising a multiplicity of juxtaposed tuned reeds each of which cantilevers from a supported end thereof to a free end thereof, key controlled striking means for impulsively exciting said respective reeds for vibration, an integral electrically conductive pick-up plate extending across the free ends of said reeds for electrostatically sensing vibrations of the reeds; said pick-up plate having a plurality of electrically conductive portions thereof disposed in proximate, electrically capacitive relation to the normal positions of said respective reeds to provide electrical capacitance between said pick-up plate and each reed which is varied by impulse induced vibrations of the reeds relative to the pick-up plate; means for applying a substantial electrical voltage between said pick-up plate and said reeds, and electronic tone signal means coacting with said pick-up plate and said reeds to produce tone signals controlled by the cumulative capacitance between said pick-up plate and said reeds.

9. In an electronic piano, the combination comprising a multiplicity of tuned electrically conductive reeds mounted alongside each other in a manner such that each reed cantilevers from a supported end thereof to a free end thereof, key controlled striking means coacting with each of said respective reeds to impulsively excite the reed to vibrate freely in a manner which swings the free end of the reed to opposite sides of a rest position thereof, an electrostat-ic pick-up including conductor portions disposed in adjacent electrically capacitive relation to the free ends of said respective reeds, each of said pick-up conductor portions being substantially flush with one longitudinal side of the coacting reed when the latter is in its normal position, each pick-up conductor portion being shaped and positioned to extend along the swing of the coacting reed in only one direction of reed movement from the normal position of the reed, the orientation of each reed in its coacting pick-up conductor portion being such that the electrically capacitive spacing between the reed and the conductor portion progressively increases as the reed swings away from its normal position in said one direction of reed movement, means for charging said pick-up to a substantial electrical potential relative to said reeds, and electronic tone signal means coacting with said pick-up and said reeds to produce tone signals controlled by the capacitance between said pick-up and said reeds.

### B. F. MEISSNER # 2,942,512

1. In combination in an electrical musical instrument, a fixed-free reed, an impulse exciting means comprising a key actuated hammer adjacent the reed selectively engageable with the individual reed for setting it into decadent free vibration, and an electric translation pick-up adjacent the reed, said pick-up having a tone producing portion located alongside and being vibratorily passed by a longitudinally intermediate edge portion of the reed and being of an effective thickness, in the direction of reed vibration, smaller than the high-amplitude stroke of said edge portion of the reed.

2. In combination in an electrical musical instrument, a fixed-free reed, an impulse exciting means comprising a key actuated hammer adjacent the reed selectively engageable with the individual reed for setting it into decadent free vibration, and an electric translation pick-up adjacent the reed, said pick-up having a tone producing portion located

alongside and being vibratorily passed by a longitudinally intermediate edge portion of the reed, being of an effective thickness, in the direction of reed vibration, smaller than the high-amplitude stroke of said edge portion of the reed, and being offset in said direction from effective alignment with the rest position of the reed.

6. In combination in an electrical musical instrument, a mechanical system comprising a fixed-free reed and an impulse exciting means comprising a key actuated hammer adjacent the reed selectively engageable with the individual reed for setting it into decadent free vibration, an electric translation pick-up adjacent the reed, said pick-up having a tone producing portion located alongside and being vibratorily passed by a longitudinally intermediate edge portion of the reed and being of an effective thickness, in the direction of reed vibration, smaller than the high amplitude stroke of said edge portion of the reed, and means comprised in said mechanical system for at least substantially eliminating from the free vibration of the reed a lower one of its normally present upper partials.

9. In combination in a musical instrument, a fixed-free reed, single-impulse exciting means comprising a key actuated hammer selectively engageable with the individual reed for setting it into decadent free vibration, a mechanico-electrical system consisting of a portion of the reed and pick-up means associated with and influenced by said portion for translating electric oscillations from the reed vibrations, means comprised in said mechanico-electrical system for at least substantially eliminating from said oscillations an inharmonic component corresponding to a lower one of the upper partials at which the reed tends to vibrate, and means also comprised in said mechanico-electrical system for introducing into the oscillations translated from the fundamental reed vibrations a series of upper partials harmonically related thereto.

C. W. ANDERSEN # 2,949,053

1. An electronic musical instrument comprising a common reed support, a plurality of reeds with bases fixed on said common support and with vibratile tongues projecting in the same direction therefrom in side-by-side substantially coplanar parallelism from said support, a plurality of hammers respectively percussively engageable with the tongues of said reeds respectively to set said reed tongues in decadent free vibration, a plurality of manually engageable keys respectively operatively connected to said hammers for selectively moving said hammers into such percussive engagement with said reed tongues, a pick-up member of comb-like configuration having a plurality of parallel teeth and an intermediate plurality of slots each opening at one end, means mounting said pick-up member in opposition to said reeds substantially in a common plane therewith with the reeds projecting into the slots between the teeth, the teeth on opposite sides of a reed extending substantially the same distance therealong, there being at least one reed tongue in each slot, and each reed being closely adjacent a pick-up tooth along a longitudinal edge of said reed, said pick-up teeth terminating at free ends short of the reed bases, the hammers respectively percussively engaging the reed tongues between the reed bases and the free ends of the adjacent pick-up teeth, said reeds and said pick-up member comprising electrostatic tone generating means, means establishing an electric potential between said reeds and said pick-up member, electric oscillations being generated in accordance with the change in capacity between said reeds and said pick-up member resulting from free decadent vibration of said reeds relative to said pick-up member, electronic amplifying means connected to said reeds and said pick-up member for amplifying the oscillations generated by the decadent free vibration of said reed tongues, and electro-acoustic translating means connected to said amplifying

means for converting the amplified oscillations into audible tones.

2. An electronic musical instrument as set forth in claim 1 wherein the plane of said reeds is displaced from the median plane of the pick-up teeth, and wherein said reeds vibrate asymmetrically about such median plane.

3. An electronic musical instrument as set forth in claim 1 and further including common means electrically grounding said plurality of reeds.

5. An electronic musical instrument as set forth in claim 1 wherein the reed tongues and the teeth of the pick-up are substantially rectangular in cross-section and in outline to provide a sharp tonal reaction.

### H. E. W. BODE # 3,154,997

1. A vibratory reed for use as in a musical instrument comprising a base adapted to be secured to a mounting surface, and a flat tongue having lateral and longitudinal dimensions extending freely out from said base, said tongue having a curved inward taper extending out from said base merging into substantially parallel edges, said curved taper comprising a substantial portion of the total length of said tongue and having a length greater than the transverse dimension of said tongue.

2. A vibratory reed for use as in a musical instrument comprising a base adapted to be secured to a mounting surface, and a flat tongue having lateral and longitudinal dimensions extending freely out from said base, said tongue having a curved inward taper extending out from said base merging into substantially parallel edges said curved taper comprising between substantially 10 and 50 percent of the total length of said tongue and having a length greater than the transverse dimension of said tongue.

3. A vibratory reed for use as in a musical instrument comprising a base adapted to be secured to a mounting surface, and a flat tongue having lateral and longitudinal dimensions extending freely out from said base, said tongue having a curved inward taper extending out from said base merging into substantially parallel edges, said curved taper comprising between substantially 20 and 35 percent of the total length of said tongue and having a length greater than the transverse dimension of said tongue.

4. A vibrating reed arrangement for use as in a musical instrument comprising a fixed mounting base, a reed including a base and a tongue having lateral and longitudinal dimensions extending freely out therefrom, means mounting said reed base on said mounting base, said reed tongue having a curved inward taper extending out from the reed base merging into substantially parallel edges of said tongue, said curved taper comprising a substantial portion of the total length of said tongue and having a length greater than the transverse dimension of said tongue, and a striker member adapted impulsively to engage said reed tongue to set said reed tongue in free, decadent vibration.

5. A vibrating reed arrangement for use as in a musical instrument comprising a fixed mounting base, a reed including a base and a tongue having lateral and longitudinal dimensions extending freely out therefrom, means mounting said reed base on said mounting base, said reed tongue having a curved inward taper extending out from the reed base merging into substantially parallel edges of said tongue, said curved taper comprising a substantial portion of the total length of said tongue and having a length greater than the transverse dimension of said tongue, and a striker member adapted impulsively to engage said reed tongue outwardly of said tapered portion to set said reed tongue in free, decadent vibration.

6. A vibratory reed as set forth in claim 3 wherein the curved taper is a non-circular arcuate curve.