**ATLAS POWDER COMPANY, Plaintiff,**

v.

**E.I. DU PONT DE NEMOURS AND COMPANY and Alamo Explosives Company, Inc., Defendants.**

**Civ. A. No. CA–3–79–1562–G.**

United States District Court,
N.D. Texas,
Dallas Division.

June 14, 1983.

---

Garland P. Andrews and V. Bryan Medlock, Jr., Richards, Harris & Medlock, Dallas, Tex., for plaintiff.

Stanley E. Neely, Locke, Purnell, Boren, Laney & Neely, Dallas, Tex., Joseph M. Fitzpatrick, Fitzpatrick, Cella, Harper & Scinto, New York City, for defendants.

## MEMORANDUM OPINION

PATRICK E. HIGGINBOTHAM, District Judge.

This patent infringement suit involves ammonium nitrate fuel oil ("ANFO") explosives that are used in the form of a water-in-oil emulsion. ANFO explosives are used extensively in mining and construction because they are inexpensive and, in contrast to explosives containing high explosive ingredients such as TNT, they can be transported and handled with relative safety. Because they cannot be detonated without an outside charge equivalent to a no. 8 blasting cap, they enjoy an industry classification of "blasting agents." [1] At the same time, ammonium nitrate is exceptionally soluble in water, a distinct disadvantage in wet application such as in wet "bore holes." Coxon, Ammonium Nitrate Explosives—Some Experimental Mixes, paper delivered to Aus. I.M.M. Annual Conference, 1963, Defendants' Exhibit 130, Tab 11 at 2. In a wet bore hole some of the ammonium nitrate in a common ANFO mix will dissolve. The mix will become insensitive and fail to detonate.

In response to this problem, the explosives industry developed slurry mixes of ammonium nitrate in water. Slurries are resistant to water but have less explosive power than a pure ANFO mix. In order to obtain the power necessary for commercial use, the industry added high explosives, such as TNT, or chemical sensitizers to the slurries. Defendants' Exhibit 130, Tab 11 at 2, 9; Plaintiff's Exhibit 16. It was also

---

**1.** The basic terms of explosives technology are defined in Appendix A.

necessary to add gelling agents to some of these mixtures to prevent the chemical sensitizers from separating from the slurries. *See* Transcript at 799. The use of sensitizers and gelling agents significantly increased the cost and the danger of explosion of the ANFO blasting agents. *See* Transcript at 402, 442; Plaintiff's Exhibit 57.

On June 3, 1969, Atlas Powder Co. obtained a patent which claimed to eliminate the need for high explosive or chemical sensitizers while retaining the water resistance of the gels and slurries. The patent, entitled "Ammonium Nitrate Emulsion blasting Agent and Method of Preparing Same," U.S. Patent No. 3,447,978 (hereinafter the "Bluhm patent" for its assignor, inventor Harold F. Bluhm), describes a water-in-oil emulsion slurry blasting agent consisting essentially of water, ammonium nitrate, a carbonaceous fuel, and an emulsifying agent. The ammonium nitrate, or similar oxidizing agent, is placed in a water solution. This solution is mixed with fuel and the emulsifier to create a water-in-oil emulsion. In addition, air is entrapped or occluded in the emulsion to sensitize it.

Atlas alleges that the defendants, E.I. Du Pont de Nemours and Alamo Explosives Company, Inc. (collectively "Du Pont"), have infringed the Bluhm patent. Atlas alleges that Du Pont infringed the patent by manufacturing and selling Du Pont's products, EL–881, Tovex E, and Tovex EA–4, and that Alamo infringed the patent by reselling these same products. Atlas claims that the accused products and the process for making them infringe upon the Bluhm patent product and process. Specifically, Atlas alleges that Du Pont has infringed the Bluhm patent's product claims 1, 2, 3, 4, 5, 7, 12, 13, 14, 16 and 17. Claim 1 sets forth in general terms the patent's product claims:

> An emulsion blasting agent consisting essentially of
>
> ■ an aqueous solution of ammonium nitrate forming a discontinuous emulsion phase;
>
> ■ a carbonaceous fuel forming a continuous emulsion phase;
>
> ■ an occluded gas dispersed within said emulsion and comprising at least 4% by volume, thereof at 70°F. and atmospheric pressure; and
>
> ■ a water-in-oil type emulsifying agent;
>
> said carbonaceous fuel having a consistency such that said occluded gas is held in said emulsion at a temperature of 70°F.

Bluhm Patent, Col. 14, lines 9–21 (numbering added). The other product claims are dependent on claim 1 and set forth specific ranges of the four major components in claim 1. (The complete text of the patent is attached as Appendix B). Atlas also alleges that Du Pont has infringed the patent's process claims 18, 20, 21, 22, 24, and 30. Claim 18 describes in general terms the patent's process claims:

> A process for preparing an emulsion blasting agent which comprises:
>
> (a) preparing with a water-in-oil type emulsifying agent an emulsion of:
>
> > (1) an aqueous ammonium nitrate solution as a discontinuous emulsion phase; and
> >
> > (2) a liquid carbonaceous fuel as a continuous emulsion phase;
>
> (b) thickening by cooling said liquid carbonaceous fuel to a consistency such that a gas may be occluded therein; and
>
> (c) occluding at least 4% by volume at 70°F. and atmospheric pressure of a gas in the thickened emulsion.

Bluhm Patent, Col. 15, lines 36–49. The other process claims are dependent on and represent slight variations of claim 18.

Du Pont counterclaims, arguing that the Bluhm patent should be declared invalid because it was anticipated by the prior art, 35 U.S.C. § 102, it was obvious to one of ordinary skill in the art, 35 U.S.C. § 103, it does not set forth the "best mode" for making the invention, it is a mere invitation to experiment, and its claims are overly broad, 35 U.S.C. § 112. Du Pont also argues that the Bluhm patent is invalid because Atlas committed fraud on the Patent

Office in obtaining the patent. Finally, Du Pont argues that even if the patent is valid, it has not been infringed by the accused products.

## I. VALIDITY

### A. *Presumption of Validity and Burden of Proof*

■ Congress requires judicial deference to the judgment of the Patent Office in considering the validity of a patent:

A patent shall be presumed valid .... The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting it.

35 U.S.C. § 282. This statute creates a rebuttable presumption of validity in favor of a patent. If the Patent Office considered all the pertinent prior art, the presumption of validity remains at full strength and the party challenging the patent must prove invalidity by "clear and convincing evidence" or "beyond a reasonable doubt." *Baumstimler v. Rankin*, 677 F.2d 1061, 1066 (5th Cir.1982). If pertinent prior art was not cited to the Patent Office, the presumption is weakened and the party challenging the patent must prove invalidity by a preponderance of the evidence. *Id.*

■ Du Pont's prior art expert, Dr. Kury, testified that "the starting point" for those interested in improving slurried ANFO blasting agents was the Gehrig patent, U.S. Patent No. 3,164,503. Defendants' Exhibit 130, Tab 4. *See* Transcript at 798–99. Atlas had cited the Gehrig patent to the patent examiner, but it had failed to cite a number of other pertinent prior art references, including the process for making Aquanite, the commercial version of the Gehrig patent.[2] Because significant prior art was not before the examiner, the Bluhm patent's presumption of validity is weakened and Du Pont need prove invalidity by only a preponderance of the evidence.

With the burdens so defined, I turn to the specific challenges Du Pont has made to the Bluhm patent.

2. The prior art references, discussed below, which Atlas failed to cite to the Patent Office

### B. *Anticipation*

■ Du Pont claims that the Bluhm patent is invalid because its claims were anticipated by work which was previously available to the public. The "defense" of anticipation derives principally from 35 U.S.C. § 102(a):

A person shall be entitled to a patent unless

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant.

A patent will not be invalidated under this section "unless all of the same elements or their equivalents are found in substantially the same situation where they do substantially the same work in the same way." *Continental Oil Co. v. Cole*, 634 F.2d 188, 195 (5th Cir.), *cert. denied*, 454 U.S. 830, 102 S.Ct. 124, 70 L.Ed.2d 106 (1981). The Fifth Circuit has noted that "there is authority that anticipation requires that all material claimed features of a patent be contained in a single prior art reference." *Steelcase, Inc. v. Delwood Furniture Co.*, 578 F.2d 74, 79 (5th Cir.1978), *cert. denied*, 440 U.S. 960, 99 S.Ct. 1503, 59 L.Ed.2d 774 (1979).

■ Du Pont urges that the Bluhm product claims were anticipated by the Egly patent, U.S. Patent No. 3,161,551. Defendants' Exhibit 130, Tab 3. The Egly patent, by itself, does not anticipate the Bluhm product because it contemplates a blasting agent composed of an emulsion poured over solid ammonium nitrate "prills." There is no other single invention or publication that anticipates the Bluhm product claims. Du Pont's expert, Dr. Kury, testified that various features of prior inventions and publications had pointed the way to the Bluhm patent. *See* Transcript at 799–816. This overlap is insufficient to support a finding of anticipation.

were the Rowlinson patent, the Davis patent, the Clay patent, and the Coxon papers.

■ Du Pont urges that the Bluhm process claims were anticipated by Atlas's process for making its commercial blasting agent, Aquanite. The two processes are not identical. Aquanite, composed of ammonium nitrate, fuel oil, a water-in-oil emulsifier, and nitric acid, required the addition of a gelling agent to ensure its stability. Transcript at 140–42. Because the Bluhm emulsion does not contain nitric acid, it does not require the extra step of adding a gelling agent. The anticipation defense is too narrow to encompass this extra step. The Aquanite process did not anticipate the Bluhm patent's process claims.

### C. Obviousness

■ Du Pont contends that the Bluhm patent's product and process claims are invalid because they were obvious. Title 35, § 103 requires that an invention not be obvious if it is to be patented:

A patent may not be obtained ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

To make a determination of obviousness under § 103, the court must determine the scope and content of the prior art and the level of ordinary skill in the pertinent art, then ascertain the differences between the prior art and the claims in-suit.

### 1. The Scope of the Prior Art

■ The scope of the prior art is that art that would have been considered by those endeavoring to solve the problem that the patent in-suit allegedly solves. *I.U. Technology Corp. v. Research-Cottrell, Inc.*, 641 F.2d 298, 303 (5th Cir.1981). The problem allegedly solved by the Bluhm

patent was the need for a water resistant ANFO blasting agent with good detonation properties that did not need costly chemical sensitizers. The relevant art for solving such a problem would be the art of explosives formulation. Other references or information from analogous fields that would have been considered by a problem solver in this area must also be considered. *Id.* at 304–05. Specifically, a problem solver in this situation would be expected to consider information concerning the properties of emulsifiers as applied to explosives formulation.

### 2. The Problem Solver's Level of Skill

■ In determining obviousness the court must view the prior art from the perspective of a hypothetical person, "one ordinarily skilled in the art." 35 U.S.C. § 103. In this case, the problem solver would be skilled in the art of explosives formulation. He would need knowledge of and experience with the chemical and physical properties of explosives. This person of ordinary skill in the art should be a chemist or chemical engineer, with at least a bachelor's degree and preferably an advanced degree, as well as several years of varied practical experience. He should also have a working knowledge of the basic principles of emulsion chemistry as applied to explosives formulation.[3] Having defined the standard of skill and knowledge of prior art with which the hypothetical problem solver is charged, I now examine the Bluhm patent in light of the relevant prior art to determine whether the Bluhm invention would have been obvious to one skilled in the art in 1966 who was familiar with all of the pertinent prior art.

### 3. Product Claims

### a. A straightforward development from Gehrig?

Du Pont contends that the Bluhm product claims were an obvious development

---

**3.** One of Atlas' experts, Dr. Alan Bauer, does not have a background in chemistry. Dr. Bauer has degrees in physics and math and a Ph.D. in metallurgy as well as extensive practical experience with a variety of explosives. *See* Transcript at 395. Dr. Bauer's chemistry will not be credited to the extent that it touches on the chemistry of explosives formulation, but, given the importance of practical experience, it will be considered in comparing the physical properties of prior art compositions with the Bluhm patent.

from U.S. Patent No. 3,164,503 (the Gehrig patent). Defendant's Exhibit 130, Tab 4. The Gehrig composition is an ANFO slurry that contains some of the ingredients found in the Bluhm emulsions. The patent describes an emulsion of ammonium nitrate, water, and fuel oil, sensitized with nitric acid, and gelled. *Id.;* Transcript at 454–57, 625. Although the patent does not name occluded air as one of its components, in its commercial form it requires about seven percent air to detonate. Defendant's Exhibit 135, at 25.

A water-in-oil emulsion, such as the Bluhm composition, consists of a continuous oil phase that completely surrounds a water phase. An example of a water-in-oil emulsion is mayonnaise. In a gel, however, the two phases are combined to produce a viscous, jelly-like product. The differences between the Bluhm emulsion and the Gehrig gel are significant. The gel must contain some air to detonate but it is not nearly as efficient in air entrainment as an emulsion. As the Gehrig gel dries, its air bubbles eventually flatten and collapse. Plaintiff's Exhibit 19, at 29. In contrast, the Bluhm emulsion contains evenly distributed, fine particles of entrapped air. *See* Transcript at 596–99; Plaintiff's Exhibits 307 and 308. Moreover, unlike the Bluhm emulsion, the Gehrig composition cannot be detonated without a chemical sensitizer. *See* Transcript at 631–32; Plaintiff's Exhibit 320. The sensitizer, nitric acid, causes the mixture to be caustic and instable. Transcript at 142, 799.

Despite the differences between Gehrig's nitric acid slurry and Bluhm's emulsion, Dr. Kury testified that in 1966 it would have been obvious to leave the nitric acid out of Gehrig's slurry and to sensitize it in some other way. If this were done, the gelling agent would be eliminated as well because in Dr. Kury's view the only reason for this stabilizing or gelling ingredient was to "tie up" the nitric acid. Transcript at 799. According to Dr. Kury, the two mechanisms other than chemical or high explosive sensitizers for sensitizing explosives were (1) the intimate mixing of the fuel oil and ammonium nitrate, and (2) the entrapment of air to create reaction centers or hot spots in the explosive. Transcript at 789. He testified that it would have been obvious to one skilled in the art who was aware of these two mechanisms to take the nitric acid blasting agent and reformulate it to produce the Bluhm product, a water-in-oil emulsion which allows for intimate mixing and efficiently entrains air.

■ The Gehrig patent reveals little about these two mechanisms for sensitizing blasting agents. The patent makes no reference to the intimate mixing of fuel oil and ammonium nitrate. Gehrig's research records contain a single statement about the sensitization properties of air:

There appears to be increasing evidence that sensitivity and detonability is related to the number of fine bubbles trapped in the slurry. Bubbles, by creating hot spots increase the rate of reaction of the explosive in the detonation zone.

Gehrig Deposition Exhibit 7, at 27. The patent itself does not discuss the importance of aeration to sensitize the composition. It merely mentions that microballoons (*i.e.*, tiny glass spheres) may be used to stabilize the mixture and even suggests that after the gel is formed it should be heated to *remove* entrapped air. Defendant's Exhibit 130, Tab 4, Col. 7, lines 58–72, and Col. 8, lines 23–24. Viewed as a whole, Gehrig's work would not have made it obvious that aeration and intimate mixing could serve as a substitute for the nitric acid sensitizer.

Du Pont asserts, however, that a number of other prior art references concerning aeration and the intimate mixture of the fuel and ammonium nitrate would have made it obvious to one skilled in the art to put the Gehrig gel into the form of a water-in-oil emulsion with entrained air.

b. *Intimate mixing*

Dr. Kury testified that a number of prior art references taught that emulsifying the Gehrig gel would increase its sensitivity by promoting the intimate mixture of ammonium nitrate and fuel oil. The first of these

was U.S. Patent No. 3,161,551 (the Egly patent). Defendants' Exhibit 130, Tab 3. The Egly patent, which describes a two-component blasting agent, contains some of the same ingredients as the Bluhm patent. Its first component was formed by dissolving a small amount of ammonium nitrate in water and combining it with fuel oil in a water-in-oil emulsion. This emulsion was used as a wetting agent that was poured over solid ammonium nitrate prills to form a blasting agent. Defendants' Exhibit 130, Tab 3, at Col. 2, lines 48–63; Transcript at 665–66. The Egly patent merely taught that the emulsion could be used as a wetting agent. The emulsion was not detonable by itself, nor did it create an acceptable blasting agent when added to the solid prills. Plaintiff's Exhibit 121 at E013404; Transcript at 833–35. The Egly patent does not suggest that an emulsion made from the ingredients of the Gehrig composition would make an effective blasting agent.

Kury also cited U.S. Patent No. 3,052,578 (the Davis patent). Defendants' Exhibit 130, Tab 2. Like the Egly patent, the Davis patent describes a two-component blasting agent. The first component is a blend of fuel oil and a small amount of ammonium nitrate. This blend is then poured over solid ammonium nitrate prills. The patent does not even mention emulsifiers and it does not contemplate the formation of an emulsion; rather, its specifications refer to the addition of a small quantity of an oil-in-water emulsifier to aid in the dispersal of the fuel throughout the blend. *Id.* at Col. 6, lines 37–40.

Dr. Kury referred to two papers by R.W. Coxon as references that teach that emulsifiers can be used to increase the intimate mixing of ammonium nitrate with fuel oil, thus enhancing the explosive's sensitivity. The first of the Coxon papers, Defendant's Exhibit 130, Tab 11, describes a water-in-oil emulsion of fuel oil and ammonium nitrate in water. The emulsion is poured over ammonium nitrate prills. *Id.* at 8. This paper concerns the use of an emulsion to increase the reaction interface between the solid ammonium nitrate and the fuel oil. It

does not teach that an emulsion could, by itself, perform as a water resistant blasting agent. This is true of the second Coxon paper as well. Defendant's Exhibit 130, Tab 12. Further, the second paper specifies that the preferred type of wetting agent for these explosives is an oil-in-water emulsion, rather than a water-in-oil emulsion. *Id.* at 4; Transcript at 623.

Finally, Dr. Kury cited U.S. Patent No. 3,004,842 (the Rowlinson patent) as teaching that an emulsion would make an effective explosive because it promotes the intimate mixing of fuel oil and ammonium nitrate. Defendants' Exhibit 30, Tab 1. The Rowlinson patent states: "To achieve intimate mixing of the ammonium nitrate with the fuel it may be necessary to employ an emulsifying agent." *Id.* at Col. 2, lines 46–48. This patent, however, describes a composition containing little water which is heated to a molten state, then hardened into a stick. *Id.;* Transcript 620–21. It teaches that an emulsifier will disperse fuel in a molten mass; it does not teach that placing a slurry blasting agent in the form of an emulsion would increase its detonability.

None of the references cited by Du Pont show that it would have been obvious to one skilled in the art to formulate explosives as water-in-oil emulsions to achieve intimate mixing of fuel oil and ammonium nitrate. A number of the references indicate uses for oil-in-water, not water-in-oil, emulsifiers in explosives. Of the references that do employ water-in-oil emulsifiers, none suggests that an explosive's detonability will be improved by putting it into the form of an emulsion.

Further, there is some question whether formulating explosives as water-in-oil emulsions would, in fact, be the best way to achieve intimate mixing of fuel oil and ammonium nitrate. Dr. Fowkes, an emulsion chemist, was asked whether he would use an emulsion if his "real purpose was to get a very intimate mixture of fuel oil and an oxidizer." Transcript at 626. He responded,

I would think you could get [a] better, more intimate contact [by pouring] an aqueous solution onto ammonium nitrate prills than with an emulsion.

*Id.* The approach used by Egly and Davis is consistent with Fowkes's contention about the best technique for intimately mixing ammonium nitrate and fuel oil.

In sum, Du Pont has failed to show that it would have been obvious to one skilled in the art in 1966 to put a slurry explosive into the form of a water-in-oil emulsion to promote the intimate mixing of fuel oil and ammonium nitrate.

### c. *Aeration as a Sensitization Mechanism*

Du Pont also asserts that the prior art in 1966 would have made it obvious that aeration of the Gehrig slurry in the form of an emulsion could serve as a substitute for chemical sensitizers. Atlas admits that it was known in the art in 1966 that an explosive must contain some air or other gas to detonate, but disputes that it would have been obvious to sensitize an ANFO slurry by aeration rather than chemical sensitizers.

Dr. Kury cited the Rowlinson patent, Defendants' Exhibit 130, Tab 1, as evidence that those skilled in the art in 1966 recognized the importance of air as a sensitization mechanism. Rowlinson noted the "surprising" fact that the aeration of a molten cast composition by the addition of foaming agents increases its sensitivity. *Id.* at Col. 1, lines 44–48. It had long been recognized in the art that dry ANFO mixes such as the one described in the Rowlinson patent did not require chemical sensitizers, but slurry ANFO mixes, which contain a considerable amount of water, had always required chemical sensitizers to give them commercially acceptable detonation properties. It is quite a leap from recognition that dry ANFOs could be sensitized by aeration to realization that if an ANFO slurry was placed in the proper form of a

water-in-oil emulsion and aerated, it would not require chemical sensitizers for detonability. This leap would not have been obvious in 1966.

Another reference cited by Dr. Kury is U.S. Patent No. 3,453,158 (the Clay patent). Defendants' Exhibit 130, Tab 8. The Clay patent describes a blasting agent composed of ammonium nitrate in aqueous solution, fuel oil, and sensitizers, in a gel form. *Id.; See* Transcript at 462–69, 628. The patent states:

> [The composition is] then stirred together with agitation so as to create within the gel or slurry many tiny spaced but widely distributed voids or bubbles of air. . . . These voids or bubbles distributed widely and fairly homogeneously through the liquid phase are found to be highly effective sensitizers in themselves. They appear to act as reaction centers or "hot spots" to propogate the detonation wave when the explosive slurry or gel is set off.

Defendants' Exhibit 130, Tab 8, Col. 3, lines 48–50, Col. 4, lines 25–30.

The significance of Clay's teaching about aeration was obscured by the fact that his explosive contained two chemical sensitizers, aluminum and a "pre-mix" consisting primarily of sulfur.[4] Also, the Clay patent is for a gel product rather than an emulsion. As noted above, such compositions do not entrain air as efficiently as emulsions.

Dr. Kury also mentioned U.S. Patent No. 3,288,661 (the Swisstack patent) with respect to aeration. Defendants' Exhibit 130, Tab 6. This patent is a gel formed from an aqueous solution of oxidizer salts, such as ammonium nitrate, and either chemical or high explosive sensitizers. The patent's specifications teach that pumping air into the gel increases its stability and sensitivity, and that adding an emulsifier will also increase its stability by controlling the size of the air bubbles. Defendants' Exhibit 130, Tab 6, at Col. 2, lines 3–28. As was

---

**4.** Clay claimed to be able to eliminate the aluminum from his composition in warm bore holes, but the sulfer pre-mix sensitizer was required

under all conditions. Defendants' Exhibit 130, Tab 8, Col. 8, lines 15–19; Transcript 466–67.

the case with Clay, these teachings were obscured by the fact that Swisstack used chemical and high explosive sensitizers. In addition, although the Swisstack composition mentions emulsifiers, it was a gel and did not discuss formulating explosives as water-in-oil emulsions to increase their air entrainment efficiency.

Although there was prior art that discussed aeration as a sensitization mechanism it did not make it obvious that aeration could serve as a substitute for chemical sensitizers. The references cited by Du Pont deemphasize the importance of aeration. Egly and Davis do not mention air or gas as an ingredient in their explosives. In fact, one of the Coxon papers teaches that detonation performance may be improved by using emulsifiers to eliminate frothing (air) from an explosive. Defendant's Exhibit 130, Tab 11, at 10.

In sum, Gehrig's work with nitric acid slurries and the Rowlinson, Clay and Swisstack patents provided some indication to those in the art in 1966 that aeration was a means of sensitizing an explosive. On the other hand, these references do not teach that aeration can substitute for chemical sensitizers in slurry explosives or that a water-in-oil emulsion is the most efficient system for entraining air.

### d. Conclusion—The Bluhm Patent's Product Claims Are Not Invalid as Obvious

The Supreme Court has warned that in evaluating obviousness, a court must avoid "slipping into the use of hindsight" and "resist the temptation to read into the prior art the teachings of the patent in issue." *Graham v. John Deere Co.,*

383 U.S. 1, 36, 86 S.Ct. 684, 703, 15 L.Ed.2d 545 (1966), *quoting Monroe Auto Equipment Co. v. Heckethorn Mfg. & Sup. Co.,* 332 F.2d 406, 412 (6th Cir.1964). The Bluhm patent's product claims might appear obvious with 20/20 hindsight, but the review of the prior art indicates that in 1966 these claims were not obvious to one skilled in explosives formulation.[5] Those in the art were, in Dr. Kury's words, "beginning to understand" that several mechanisms could be used to enhance the performance of slurry explosives, Transcript at 795, but they did not appreciate the significance of formulating explosives as water-in-oil emulsions that efficiently entrained air.

### 4. Process Claims

Du Pont argues that the process claims of the Bluhm patent are invalid because they would have been obvious in 1966. The Bluhm process claims describe the preparation of an emulsion of an aqueous ammonium nitrate solution and liquid fuel oil. The emulsion is thickened by cooling and gas is occluded into it either by a mixer or by direct introduction. Bluhm Patent at Col. 15, lines 35–49; Col. 5, lines 53–61.

Process claims, such as the Bluhm claims, that describe the technique for manufacturing a product, are known as method-of-making claims. *See In re Mancy,* 499 F.2d 1289, 1293 (C.C.P.A.1974). In method-of-making cases the invention is a process. No matter how novel the product may be, the claimed process steps and statutory materials may themselves still be old and the process therefore obvious. *Id.* The process itself, considering the prior

---

**5.** *Graham v. John Deere Co.,* 383 U.S. at 17–18, 86 S.Ct. at 693–94 (1966), points out that "commercial success" of a product and whether it represents a solution to a long-felt commercial need are additional factors that may be considered by a court in determining obviousness. In light of the court's finding that there were substantial differences between the prior art and the Bluhm patent's product claims, it is not necessary to consider these secondary factors. The court notes that Atlas did market products that were encompassed by the claims of the

Bluhm patent and has sold 200 million pounds of these explosives. Transcript at 674–84. Du Pont disputes the products' commercial success and the fact that they satisfied long-felt needs. Du Pont's argument is undercut by the fact that one of its own researchers characterized the Atlas products as a threat to its water gel products, and this perceived threat was one of the factors that led Du Pont to develop its own water-in-oil emulsions. Plaintiff's Exhibit 375 at 136.

art, must satisfy the statutory conditions for patentability. *In re Kanter,* 399 F.2d 249, 251 (C.C.P.A.1968). The product of the process is not considered part of the prior art. *In re Kuehl,* 475 F.2d 658, 662 (C.C.P.A.1973). However, if a new product may be made by one of several obvious processes, these methods cannot be considered patentable. *In re Larsen,* 292 F.2d 531, 533 (C.C.P.A.1961).

The Bluhm process is to make an emulsion and aerate it. Atlas's expert, Dr. Fowkes, testified that the Bluhm patent uses the "brute force" method of making emulsions (*i.e.,* whipping the ingredients together), which is one of the two basic techniques for making emulsions. Transcript at 633. One skilled in the art of explosives formulation would be familiar with the basic principles of emulsion chemistry and, therefore, would have been aware of the brute force method of making emulsions.

Several of the prior art references involve water-in-oil emulsions. The Egly patent includes a water-in-oil emulsion as one of its ingredients, but does not describe the process for preparing the emulsion. Coxon's work describes a water-in-oil emulsion that is prepared by stirring the ingredients together. Defendants' Exhibit 130, Tab 12, 4. It is apparent that the brute force method of manufacturing an emulsion of ammonium nitrate, water, and fuel oil was well known in 1966.

The Gehrig patent described such a process for making an emulsion which contained an extra ingredient: nitric acid. Defendants' exhibit 130, Tab 4, Col. 12, lines 65–75, and Col. 13, lines 1–4. The patent's specifications provide that a gelling agent may be added to the emulsion to stabilize it. *Id.* at Col. 7, lines 23–26. Atlas's process for manufacturing Aquanite, its commercial version of the Gehrig composition, involved the preparation of the emulsion in the form of a gel. The ingredients were mixed in either a ribbon-type mixer or a scrape surface heat exchanger. Defendants' Exhibit 135, at 29–35. This mixing process also whipped or pumped air into the composition. *Id.* at 31; 35. The mixers used to manufacture Aquanite were the same type named in the Bluhm patent's specifications.

■ The Bluhm process of mixing the emulsion ingredients together and whipping air into them was already being used in the manufacture of a similar ANFO blasting agent. It was not the making of the Bluhm emulsion that was inventive; it was the discovery of its characteristics and capabilities. "When the sole inventive concept resides in the product the claims should be limited to product claims." *In re Larsen,* 292 F.2d at 533. The process claims of the Bluhm patent, claims 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, and 30, are held invalid.

D. *Validity Requirements of 35 U.S.C. § 112*

To be valid, a patent must meet the requirements of 35 U.S.C. § 112:

> The specification shall contain a written description of the invention and of the manner and process of making and using it, [1] in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, [2] and shall set forth the best mode contemplated by the inventor for carrying out his invention. [3] The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention ... (numbering added).

The purpose of 35 U.S.C. § 112 is

> to reward ... an inventor who "refrains from keeping his invention a trade secret." The *quid pro quo* for the monopoly is disclosure which will enable those skilled in the art to practice the invention at the termination of the monopoly, and to "warn the industry concerned of the precise scope of the monoply asserted."

*Flick-Reedy Corp. v. Hydro-Line Mfg. Co.,* 351 F.2d 546, 550–51 (7th Cir.1965), *cert. denied,* 383 U.S. 958, 86 S.Ct. 1222, 16

L.Ed.2d 301 (1966) (citations omitted). Du Pont argues that the Bluhm patent is invalid under 35 U.S.C. § 112 because (1) it does not disclose the "best mode" of invention; (2) it gives instructions that are insufficient to enable one skilled in the art to make these emulsions; and (3) its claims are drawn so broadly that they fail to claim distinctly the subject matter of the patent.

### 1. Best Mode

The "best mode" requirement of 35 U.S.C. § 112 was explained in *Studiengesellschaft Kohle v. Eastman Kodak Co.*, 616 F.2d 1315 (5th Cir.), *cert. denied*, 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980):

> In interpreting § 112, the courts have emphasized the obligation of the inventor to disclose the best method contemplated by him to carry out the invention, as of he time he executes his application.
>
> . . . .
>
> On the other hand, the courts have not required the mode disclosed by the inventor be in fact the optimum mode of carrying out the invention.... Even if there is a better method, the failure to disclose it will not invalidate the patent if the inventor does not know of it or does not appreciate that it is the best method.... Instead, the thrust of the decisions in this area has been to require that the inventor act in good faith with no attempt to conceal what he feels is the best method of using the invention....

*Id.* at 1339–40 (citations omitted). Du Pont has not demonstrated that Atlas failed to meet the best mode requirement. At trial, Du Pont argued that RXL–393, the formulation of the Bluhm emulsion that Atlas was using in test runs in 1967, was the best mode at the time Bluhm filed his application and that failure to cite this formulation should result in invalidation of the patent.

Bluhm testified that at the time he applied for his patent he believed that the best fuels for making his product were Paratac and Bunker fuel oils. These fuels were not being used in the test runs of RXL–393 because they were tacky and would stick to the machinery. Atlas chose to use a non-tacky formulation because the tests were being run at the Aquanite plant, alternating with runs of Aquanite. Transcript at 198–99, 227–29. This formulation was not the best mode at the time of Bluhm's application.

■ Du Pont also argued at trial that the Bluhm patent does not meet the best mode requirement because it does not disclose any of the formulations that Atlas commercially marketed. This kind of disclosure is not required under § 112 because the statute is directed to the applicant's knowledge at the time he filed his application and does not require disclosure of the mode ultimately determined to be best. *Studiengesellschaft Kohle* at 1339–40. I credit Bluhm's testimony that he had not decided on a single preferred formulation at the time the patent was filed, but rather believed that there were a number of characteristics that contributed to an effective explosive. He put examples in his patent to demonstrate these characteristics. *See* Transcript at 236–42. Failure to cite the marketed version of the Bluhm product did not violate the best mode requirement of 35 U.S.C. § 112.

### 2. Enablement

■ Section 112 requires that the written description of the invention shall be specific enough to enable one skilled in the art to make and use the invention without undue experimentation. That one skilled in the art must perform some preliminary tests or experiments before he can make or use the invention does not invalidate the patent. *See Minerals Separation, Ltd. v. Hyde*, 242 U.S. 261, 270–1, 37 S.Ct. 82, 86, 61 L.Ed. 286 (1916); *Philip v. Mayor, Rothkopf Industries, Inc.*, 635 F.2d 1056, 1063 (2d Cir.1980). A patent does not have to be as detailed as a set of "production specifications" to meet this requirement. *See Trio Process Corp. v. L. Goldstein's Sons, Inc.*, 461 F.2d 66, 74 (3d Cir.), *cert. denied*, 409 U.S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262 (1972).

Du Pont argues that Atlas did not enable those skilled in the art to make the invention because it failed to disclose enough information about which emulsifiers would be useful in water-in-oil emulsion explosives. Atlas and Du Pont agree that one must specify the particular oxidizer and fuel that will be used before one can determine whether adding a particular emulsifier will form a water-in-oil emulsion. *See* Transcript at 577–78, 763. Because the method of emulsification described in the Bluhm patent was very general, and disclosed that a variety of different oxidizers and fuels might be employed, it would have been impossible for Bluhm to list every emulsifier that would work and exclude all that would not work. *Id.* at 579–81. However, if one skilled in the art attempted to make the invention, once the oxidizer and fuel were chosen, he could apply Bancroft's rule, a basic principle of emulsion chemistry, to determine which emulsifiers could be utilized. *Id.* at 581.

Du Pont responds that Atlas had repeated "failures" in its experimental work with emulsions, Defendants' Exhibit 134, and that the Bluhm patent does not mention a "freeze-thaw" (temperature cycling) screening test that Atlas had developed for screening emulsifiers. Du Pont's argument is undercut by the fact that its researchers had little difficulty in formulating water-in-oil emulsions with the emulsifiers and fuel/oxidizer systems listed in the Bluhm patent. Plaintiff's Exhibit 122, at 6–7; Plaintiff's Exhibit 267. It might have been useful to one skilled in the art to know about the "freeze-thaw" test and Atlas's failed experiments, but the ease with which Du Pont formulated such emulsions indicates that the patent gave sufficient instructions about selection of emulsifiers to enable one skilled in the art to make emulsions without undue experimentation.

Du Pont next argues that the Bluhm patent is not enabling because it fails to instruct how or when the air content of the emulsion can be measured. Du Pont asserts that the Bluhm patent should have included a technique Bluhm had developed to determine air content because such information is critical to the detonation properties of emulsions. *See* Transcript at 208, 214–15. The court finds that Bluhm's aeration measurement technique was not necessary to make the patent enabling. Bluhm testified that he developed the Bluhm emulsion without ever having measured its air content. Transcript 208–11. He created the measurement technique later, at the request of his patent attorney. *Id.* Moreover, Du Pont was able to duplicate the Bluhm emulsions easily, without measuring their air content. Plaintiff's Exhibit 122, at 6–7; Plaintiff's Exhibit 267.

Du Pont's final "enablement" argument is that the patent does not disclose that if microballoons are added to the composition, they must not be added until after the emulsion forms. *See* Transcript at 291–93, 320–29. Microballoons are fragile and can be destroyed if they are added during the mixing stage of emulsion formation. *Id.* The timing of adding the microballoons should have been apparent from the Bluhm patent to one skilled in the art because, as Bluhm testified, "I don't think that anyone really skilled in the art would choose to put fragile glass microspheres through a high speed mixer." *Id.* at 326.

■ In sum, although the Bluhm patent is not as detailed or complete as "production specifications" and would require one to perform some preliminary tests to make effective blasting agents, it contains sufficiently detailed instructions to enable one skilled in the art to formulate water-in-oil emulsion blasting agents.

### 3. *Overclaiming*

§ 112 requires that a patent conclude with "one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." Du Pont argues that the Bluhm patent is invalid under this provision because at the time Bluhm applied for the patent Atlas's experimental data was not sufficient to support the patent's claims. Specifically, Du Pont asserts that at the time Bluhm applied for his patent, Atlas's

experiments did not support his claims that (1) a broad range of emulsifying agents could be used and (2) the composition could detonate with as little as 4% air.

Du Pont asserts that in several of Atlas's experiments with various emulsifiers it obtained unsatisfactory results. This, according to Du Pont, represents overclaiming. If some of the emulsifiers listed in the Bluhm patent did not work, this would not necessarily invalidate the entire patent. In *Studiengesellschaft Kohle v. Eastman Kodak Co.*, 616 F.2d 1315, 1340 (5th Cir.1980), the Fifth Circuit held that where there are a myriad of operative combinations, the inclusion of a few which are not operative need not invalidate the patent. The patent's claims can be construed to exclude those inoperative combinations. *Id.; accord, Noll v. O.M. Scott & Sons Co.*, 467 F.2d 295, 300 (6th Cir.1972), *cert. denied,* 411 U.S. 965, 93 S.Ct. 2143, 36 L.Ed.2d 685 (1973).

The Bluhm patent's claims need not be construed to exclude any emulsifiers because Du Pont has not shown that any of the claimed water-in-oil emulsifying agents are inoperable. It is true that Atlas did not do actual experiments with many of the emulsifiers listed in the Bluhm patent, and forty percent of Atlas's efforts to form emulsions resulted in "failures." Defendants' Exhibit 133, Tab 5; Transcript at 753–54. On the other hand, that some of the emulsifiers were listed as failures or unsatisfactory in Atlas's records is not dispositive. The listing of an experiment as a failure is misleading. If an emulsion failed to pass a freeze-thaw temperature cooling test and remain stable for twenty-eight days it would be classified as a failure. Transcript at 763–64, 767. According to Atlas some of these emulsions were intended to be utilized as "pumpable" slurries and thus would not be required to maintain their stability for the twenty-eight day period required to pass the freeze-thaw test. Transcript at 187–88. Furthermore, some of these alleged failures might form stable emulsions with other oxidizer/fuel systems than the ones utilized in the particular experiment. Transcript at 577–78, 763.

The only experimental data Du Pont presented at trial was the testimony of Dr. William Wade, its emulsion expert, that he unsuccessfully tried to make emulsions with one of the emulsifiers listed in Claim 15 and Example 5 of the patent. Transcript at 751–52. Atlas's expert, Dr. Fowkes, testified that he formed a number of detonable emulsions using a variety of the tristearate emulsifiers specified in the Bluhm patent. Transcript at 656–61. Working at elevated temperatures, he was able to form water-in-oil emulsions with tristearate emulsifiers. *Id.* at 660. With this evidence, the court cannot construe the Bluhm patent to exclude any of the water-in-oil emulsifying agents because of inoperability.

Du Pont also argues that the Bluhm patent's claims of air content ranges are overbroad. It asserts that Atlas's experiments did not justify the patent's claims for compositions with 4 to 47 percent air. *See* Bluhm Patent, claims 1, 4, and 18. The patent's specifications explain that the preferred volume of gas or air is about 13 to 33 percent. Du Pont has not challenged claims that specify 13 to 33 percent air content (claims 5 and 21), but it argues that Atlas has not produced records of experiments that would support the patent's claims of compositions with as little as 4 percent air. Bluhm's records do not conclusively demonstrate that he produced compositions detonable with as little as 4 percent air but he testified that he had performed experiments and observations that justified these claims. Transcript at 359–60. In addition, a document he prepared before applying for the patent indicates that at least some of the water-in-oil emulsions were detonable with such air contents. Plaintiff's Exhibit 132. Based on this information, I find that Bluhm's claims of operative air content ranges are not overbroad. Du Pont's argument that the Bluhm patent's claims concerning emulsifiers and air content ranges render the patent invalid are without merit.

### E. *Fraud*

■ Finally, Du Pont contends that the Bluhm patent is invalid because Atlas violated its common law duty of truthful disclosure to the Patent Office. To render the patent invalid, the applicant must have made intentional misrepresentations to the Patent Office. Negligent omissions or misstatements are not sufficient to show fraud or misrepresentation by an applicant. *Parker v. Motorola, Inc.*, 524 F.2d 518, 535 (5th Cir.1975), *cert. denied*, 425 U.S. 975, 96 S.Ct. 2175, 48 L.Ed.2d 799 (1976).

■ Du Pont argues first that Atlas misled the Patent Office by failing to inform it that the examples listed in the patent were "prophetic" (*i.e.*, did not reflect actual experimental data). Du Pont asserts that the specific measures of density, detonation velocity, and volume of air in the examples would have led the patent examiner to believe that they were based on actual experimentation. The evidence shows that all but one of the examples were, in fact, based on experiments performed, although the results were modified to reflect Bluhm's beliefs about the most effective formulation of the invention. Transcript at 285–318. Furthermore, the examples were written in the present tense, the tense in which prophetic examples have traditionally appeared before the Patent Office. *See* Transcript at 875–76. Although the nature of the Bluhm patent's examples may have been unclear, Du Pont has not shown that Atlas intentionally misled the Patent Office in this regard.

Du Pont also argues that Atlas padded the patent's claims, specifications, and examples with emulsifiers and air content ranges that it knew would not work. As discussed above, the evidence did not show that the emulsifiers and air content ranges were inoperable. Du Pont's argument is without merit.

■ Du Pont's final fraud allegation is that Atlas intentionally withheld prior art from the patent examiner by failing to disclose information about Aquanite, the commercial version of the Gehrig patent. This information was pertinent prior art that should have been disclosed to the patent examiner, but I do not find that Atlas intentionally withheld it from the examiner. On the contrary, Atlas cited the Gehrig patent itself to the patent examiner.

## II. *Infringement*

■ Atlas argues that Du Pont's products E1–881, Tovex E, and Tovex EA–4 ("the accused products") infringed the Bluhm patent's product claim numbers 1, 2, 3, 4, 5, 7, 12, 13, 14, 16, and 17, and its process claim numbers 18, 20, 21, 22, 24, and 30. Having already determined that the process claims are invalid, I will only consider the infringement of the product claims. In determining whether an accused product infringes a valid patent, a court performs a two-step analysis. First, it determines whether the patent's claims read in light of the specifications have been literally infringed. If not, it determines whether the patent has been infringed under the doctrine of equivalents.

### A. *Literal Infringement*

The Supreme Court explained literal infringements in *Graver Tank & Manufacturing Co. v. Linde Air Products Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). "In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If an accused matter falls clearly within the claim, infringement is made out and that is the end of it." 339 U.S. at 607; *accord, Ziegler v. Phillips Petroleum Co.*, 483 F.2d 858, 868 (5th Cir.), *cert. denied*, 414 U.S. 1079, 94 S.Ct. 597, 38 L.Ed.2d 485 (1973).

■ Du Pont's products do not fall clearly within the claims of the Bluhm patent. The patent names a number of different water-in-oil type emulsifying agents in both its specifications and its examples. All of the Bluhm product claims include "a water-in-oil type emulsifying agent." The Du Pont products, on the other hand, use a substance which usually acts as an oil-in-water emulsifier. The accused products contain sodium hydroxide and oleic acide which combine to form sodium oleate. Sodium oleate will usually produce an oil-in-

water emulsion, but in the presence of high salt concentration, it acts as a water-in-oil emulsifier. The accused products have a high concentration of salt; thus, the sodium oleate in these products forms a water-in-oil emulsion. Therefore, Du Pont does produce a water-in-oil emulsion, but it uses a system different from that described in the Bluhm claims. The differences between the two emulsifiers are slight, but they preclude a finding of literal infringement because "[m]inor modifications are ... sufficient to avoid literal infringement." *Weidman Metal Masters v. Glass Master Corp.*, 623 F.2d 1024, 1026 (5th Cir.1980), *cert. denied*, 450 U.S. 982, 101 S.Ct. 1519, 67 L.Ed.2d 817 (1981), *cited in Continental Oil Co. v. Cole*, 634 F.2d 188, 197 (5th Cir.), *cert. denied*, 454 U.S. 830, 102 S.Ct. 124, 70 L.Ed.2d 106 (1981).

### B. *Equivalent Infringement*

If a minor deviation from a patent were sufficient to avoid infringement, the protection of the patent would be a "hollow and useless thing." *Graver Tank & Manufacturing Co. v. Linde Air Products Co.*, 339 U.S. at 607, 70 S.Ct. at 856. In recognition of this fact the courts have created the doctrine of equivalents, which protects patentees against "devices which incorporate unimportant variations of the patented device.... but perform substantially the same function in substantially the same way to obtain the same result." *Ziegler v. Phillips Petroleum Co.*, 483 F.2d 858, 868 (5th Cir.1973), citing *Sanitary Refrigerator Co. v. Winters*, 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147 (1929).

The doctrine provides a range of protection from equivalents which is commensurate with the degree of advance that the patent provided. *Studiengesellschaft Kohle*, 616 F.2d at 1324. The broadest range of protection is given to pioneer patents. A patent is a pioneer patent if the invention is broad and primary; it represents the greatest type of advance patentable. *Westinghouse v. Boyden Power Brake Co.*, 170 U.S. 537, 561–62, 18 S.Ct. 707, 718, 42 L.Ed. 1136 (1898). *See Shields v. Halliburton*, 667 F.2d 1232, 1238 (5th Cir.1982).

The Bluhm patent is not a pioneer patent. Although it eliminated the need for chemical sensitizers in ANFO blasting agents and it appears to perform better than the prior art gel explosives, these advances are not sufficient to entitle it to pioneer status. The Fifth Circuit has held that an intermediate level of protection will be provided for devices that, because they solve a "sophisticated and stubborn problem" in the art, are more than mere improvements or perfections. *Continental Oil Co. v. Cole*, 634 F.2d 188, 198 and n. 7 (5th Cir.1981). The Bluhm patent solved the problem of finding a water resistent ANFO blasting agent that did not require chemical sensitizers; therefore, it deserves this intermediate level of protection.

The Fifth Circuit has explained the analysis for determining infringement under the doctrine of equivalents:

> To establish equivalency for the purpose of showing infringement of a patent claim, the patentee has the burden of proving a real identity of means, operation, and result....
>
> "Consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform."

*Ziegler v. Phillips Petroleum Co.*, 483 F.2d at 868, 870, *quoting Graver Tank & Manufacturing Co.*, 339 U.S. at 609, 70 S.Ct. at 857. The one point of difference between the claims of the Bluhm patent and the Du Pont product is that the Du Pont products do not use a water-in-oil type emulsifying agent. Du Pont uses what it describes as an "in situ" emulsification system. Sodium hydroxide and oleic acid are added separately to the composition to form the oil-in-water emulsifier sodium oleate. Because of the high concentration of sale in the Du Pont product, however, the sodium oleate forms a water-in-oil emulsion.

Under the *Ziegler* analysis the sodium oleate is equivalent to a water-in-oil type emulsifying agent. The purpose of the sodium oleate is the same as that of the Bluhm patent's emulsifying agent: to cre-

ate a water-in-oil emulsion. When combined with the other ingredients, sodium oleate has the same quality as the Bluhm emulsifier. Both act as the agent which causes a water-in-oil emulsion to form. Finally, the function of the sodium oleate is the same as that of the water-in-oil type emulsifying agent used in the Bluhm patent. Both are intended to allow the water solution and oil solution to mix into a water-in-oil emulsion. It is clear that Du Pont's agent for emulsifying the accused products is interchangeable with Bluhm's water-in-oil emulsifiers. Indeed, one skilled in the art in 1966 would have known that either ingredient could be used to form the desired emulsion.

■ The equivalence of the accused products to the Bluhm patent is further demonstrated by an analysis of the heart of the Bluhm invention. If an accused product appropriates "the heart of the invention," the patent is infringed. *Weidman Metal Masters v. Glass Master Corp.*, 623 F.2d at 1030. The heart of the Bluhm invention was to put slurry explosives in the form of a water-in-oil emulsion sensitized by occluded gas and the intimate mixing provided by the emulsions form rather than by chemical sensitizers. The accused Du Pont products, Tovex E, EC–881 and Tovex EA–4, are water-in-oil emulsions which use occluded gas and the intimate mixing of the emulsion form instead of chemical sensitizers. All employ occluded gas in percentages claimed in the Bluhm patent.

Tovex EA–4 also uses small amounts of aluminum to sensitize the emulsion. Du Pont urges that this should be sufficient to avoid infringement because it uses a chemical or high explosive sensitizer and, therefore, it does not appropriate the heart of Bluhm's patent. This use does not avoid infringement. Claim 14 of the Bluhm patent includes the use of a non-water soluble particulate fuel "wherein the non-water soluble fuel is.... aluminum." Bluhm Patent, Col. 15, claim 14. The addition of small amounts of aluminum to a water-in-oil emulsion with occluded gas in the percentages claimed by the Bluhm patent does not avoid infringement.

All of Du Pont's products infringe the Bluhm patent. I need not address which of the individual claims are infringed because my holding is based upon the doctrine of equivalents rather than literal infringement.

### C. *Willful Infringement and Attorney's Fees*

■ Atlas argues that Du Pont has willfully, knowingly, and intentionally infringed its patent, entitling it to punitive damages under 35 U.S.C. § 284. The amount of punitive or exemplary damages for willful infringement cannot be fixed until after the defendant makes an accounting of its receipts for sales of the infringing product, *Swofford v. B & W, Inc.*, 336 F.2d 406, 413 (5th Cir.1964), *cert. denied*, 379 U.S. 962, 85 S.Ct. 653, 13 L.Ed.2d 557 (1965), but the court can determine whether there is a factual predicate for such an award before the defendant makes an accounting. *Wurlitzer Co. v. Electrokey, Inc.*, 380 F.Supp. 576, 582 (N.D.Tex.1974).

■ Atlas has not proved that Du Pont willfully infringed the Bluhm patent. Atlas notes that Du Pont did chemical analyses and detonation tests of the Bluhm emulsions during its research concerning emulsion blasting agents. Plaintiff's Exhibits 102, 106 and 133; Defendant's Exhibit 101. Atlas also notes that from 1969 to 1972 it was involved in negotiations with Du Pont for cross-licenses of a number of patents, including the Bluhm patent. Plaintiff's Exhibits 169 and 170; Transcript at 128–29. These negotiations indicate that Du Pont was aware of the Bluhm patent and believed it had some market value. On the other hand, the evidence indicates that Dr. Owen, the researcher who was primarily responsible for the development of Du Pont's accused products, did not copy Bluhm's work. Rather, he sought to develop an improved emulsion blasting agent and began his efforts by doing basic research on emulsion chemistry. Transcript at 697–98. After considerable effort, Defendants' Exhibit 128, Dr. Owen succeeded in developing emulsions that are more stable than the Bluhm emulsions. *See* Tran-

script at 635–36. These research efforts and this improvement do not allow Du Pont to avoid infringement, but they do indicate that Du Pont researchers were not merely copying the Bluhm patent, and that Du Pont was acting in good faith in developing its product. This means Du Pont did not willfully infringe the patent. *See John Zink Co. v. National Airoil Burner Co.*, 613 F.2d 547, 559 (5th Cir.1980); *H.K. Porter Co., Inc. v. Goodyear Tire & Rubber Co.*, 536 F.2d 1115, 1124 (6th Cir.1976).

 Atlas also argues that it is entitled to an award of attorney's fees under 35 U.S.C. § 285 because Du Pont has acted in bad faith. Atlas is not entitled to attorney fees because Du Pont acted in good faith in producing its accused products, and there is no other factor that would make this an "exceptional case" requiring such an award. *See Arbrook, Inc. v. American Hospital Supply Corp.*, 645 F.2d 273, 278–79 (5th Cir.1981).

### APPENDIX A

### GLOSSARY OF TERMINOLOGY RELATING TO EXPLOSIVE TECHNOLOGY

The definitions of the terms that appear in this glossary were derived for the most part from a glossary prepared by the plaintiff, Atlas Powder. Atlas' glossary is found at Appendix B of its Post-Trial Brief.

AMMONIUM NITRATE—chemically, $NH_4NO_3$; used as a fertilizer; often abbreviated as "AN".

ANFO—acronym for *A*mmonium *N*itrate *F*uel *O*il blasting agents which comprise particulate (normally prilled) ammonium nitrate mixed with fuel oil.

BLASTING AGENT—a cap insensitive chemical composition that contains no high explosives and thus can be transported and handled safely, but can be detonated with a high strength explosive primer.

BLASTING CAP—metal shells loaded with explosive charges used to detonate explosives. Two strengths of caps are common. A "No. 6" cap supplies enough energy to detonate most high explosives. A "No. 8" cap is significantly stronger and can initi-

ate explosives which are not "No. 6" cap sensitive.

BORE HOLE—a hole that is drilled in the surface of an area in which explosives are used. The explosives are placed in these holes, which can have varying lengths and diameters.

CRITICAL DIAMETER—the smallest diameter at which an explosive will detonate in an unconfined state.

EMULSION—a stable mixture of two immiscible liquids. As noted in Stipulated Fact 18, a "water-in-oil emulsion" is a composition comprising a continuous oil phase and a discontinuous aqueous (water) phase which can contain dissolved materials, *e.g.* mayonnaise. A "oil-in-water" emulsion is one in which the water is the continuous phase and the oil is the discontinuous phase, *e.g.*, milk.

EMULSIFYING AGENT—a substance, usually present in small amounts, which reduces interfacial tension between two liquid phases to form an emulsion. Normally the continuous phase will be formed from the liquid in which the emulsifier is soluble.

FUEL—any substance that undergoes oxidation to evolve energy during an explosive reaction.

GEL—a colloid in which the disperse phase has combined with the continuous phase to produce a viscous, jelly-like product. In explosives, a water containing product where the aqueous phase is "gelled."

GELLING AGENT—any substance that, when added to a liquid system, "gells" the same.

GLASS MICROSPHERES—very small fine hollow glass balls containing a gas.

HIGH EXPLOSIVE—explosive compositions that are sensitive to initiation by a No. 8 blasting cap.

OXIDIZER—any substance that supplies oxygen to the explosive reaction. For example, ammonium nitrate and sodium nitrate, because they are salts which do not contain carbon are commonly referred to as "inorganic oxidizing salts."

PRILLS—small round aggregates of ammonium nitrate.

PRIMER—an explosive used to initiate detonation of other, usually more difficulty detonable, charge of explosive. Sometimes referred to as a "Booster."

SENSITIVITY—a measure of the ease of initiation of an explosive composition. Thus, an explosive that will detonate using a No. 6 cap is more "sensitive" than one that requires the strength of a No. 8 cap to detonate.

SENSITIZING AGENT (OR SENSITIZER)—a substance that will enhance the ability of an explosive composition to detonate and propagate.

SLURRY EXPLOSIVE—an explosive that has water resistance because it contains a substantial amount of water.

VELOCITY (OF DETONATION)—the speed at which the explosive reaction travels along the length of the explosive charge, measured in feet/second.

WATER RESISTANCE—the ability of an explosive to resist degradation of explosive performance after contact with water. The presence of water in boreholes into which explosive charges are placed requires water resistant compositions.

## APPENDIX B

United States Patent Office

3,447,978

Patented June 3, 1969

3,447,978

AMMONIUM NITRATE EMULSION BLASTING AGENT AND METHOD OF PREPARING SAME

Harold F. Blubm, Tamaqua, Pa., assignor to Atlas Chemical Industries, Inc., Wilmington, Del., a corporation of Delaware

No Drawing. Filed Aug. 3, 1967, Ser. No. 658,033

Int. CL C06b 1/04

U.S. Cl. 149—2 30 Claims

### ABSTRACT OF THE DISCLOSURE

An emulsion blasting agent is provided having an aqueous solution component forming a discontinuous emulsion phase; a carbonaceous fuel component forming a continuous emulsion phase and preferably characterized with a gas occlusion temperature between about 70° F. and about 190° F.; and an occluded gas component dispersed within the emulsion and forming a discontinuous emulsion phase. The emulsion is generally prepared with a prescribed carbonaceous fuel component, ammonium nitrate, water, occluded gas and an emulsifying agent. The formed emulsion, which may include added optional ingredients, is usually characterized with a pH in the range of about 2 to about 8 and is found to have unexpected stability and explosive performance characteristics.

This invention relates to an emulsion type blasting agent having an aqueous solution component forming a discontinuous emulsion phase; a carbonaceous fuel component forming a continuous emulsion phase and preferably characterized with a gas occlusion temperature between about 70° F. and about 190° F.; and an occluded gas component dispersed within the emulsion and forming a discontinuous emulsion phase. More particularly, the present invention relates to an emulsion type blasting agent having four basic components and prepared by a method wherein a particularly characterized carbonaceous fuel component, aqueous solution component and an emulsifying agent are combined in prescribed amounts with occluded gas to form an emulsion system having a pH between about 2 and about 8, and having unexpected stability and explosive performance characteristics.

Slurry type blasting agents have been formulated heretofore with normally insensitive ingredients such as inorganic nitrates, water and carbonaceous fuels. Such slurry type blasting agents are generally difficulty detonable, if at all and require, for detonability, addition of a sensitizing ingredient such as TNT, nitrostarch, smokeless powder, or aluminum. Aqueous slurries of this general nature also suffer a

severe tendency for component separation and poor water resistance with a consequent deterioration in detonability. Gelling agents which are frequently added to inhibit component separation and improve water resistance generally increase the cost of such slurries without materially contributing to the explosive characteristics.

It has now been found that, although the present emulsion type blasting agent contains normally insensitive ingredients as principal components, by the practice of the present invention there results a composition having unexpectedly high sensitivity and explosive velocity with high water resistance and good storage stability. The prepared emulsion is also found to have little or no tendency for component separation even in the absence of conventional gelling agents.

Generally stated, the present invention provides a new emulsion type blasting agent having an aqueous solution component forming a discontinuous emulsion phase, a carbonaceous fuel component forming a continuous emulsion phase, and preferably characterized with a gas occlusion temperature between about 70° F. and about 190° F., and an occluded gas component dispersed within the emulsion and forming a discontinuous emulsion phase. These components are combined by a method which forms, with a water-in-oil type emulsifying agent, an emulsion system having at least about 4% by volume of occluded gas at 70° F. and atmospheric pressure, and a density below about 1.45 grams per cc. at about 70° F. and an emulsion pH within the range of about 2 to about 8.

The preferred emulsion type blasting agent of the present invention includes four principal components forming three emulsion phases. These principal components are (1) an aqueous solution component forming a discontinuance emulsion phase, (2) a carbonaceous fuel component forming a continuous emulsion phase, (3) an occluded gas component forming a discontinuous emulsion phase, and (4) a water-in-oil type emulsifying agent component.

A first component of the present emulsion system is an aqueous solution component forming a discontinuous emulsion phase. The aqueous solution component is basically formed of ammonium nitrate dissolved in water but may also include other water soluble, emulsion compatible materials.

The aqueous solution component generally includes as a basis for the prepared emulsion, 100 parts by weight of ammonium nitrate. While commercially available "fertilizer grade" ammonium nitrate is suited for use in the composition of the present invention, other grades of ammonium nitrate may also be used. Preferably, the ammonium nitrate, prior to being dissolved, is in particulate form, that is, in the form of prills, pellets or granules having a size that will pass a No. 8 USS screen since it is found that such a size rapidly dissolves in water during formation of the aqueous solution component.

The aqueous solution component may include from about 10 to about 60 parts by weight of water as based on 100 parts by weight of ammonium nitrate. In the preferred embodiment, however, the aqueous solution component includes from about 18 to about 44 parts by weight of water to form an internal or discontinuous phase of the emulsion system.

Although the aqueous solution component forming the discontinuous emulsion phase is generally present as a solution of water and ammonium nitrate, one of the preferred embodiments of the invention may include an aqueous solution component formed of ammonium nitrate and a water soluble emulsion compatible inorganic oxidizer salt such as sodium nitrate. It is generally found that the presence of a material such as sodium nitrate permits a greater quantity of oxidizer salt to be dissolved in solution at a given temperature while influencing the final density of the emulsion.

Other water soluble emulsion compatible materials which may be substituted or additionally included with the sodium nitrate in forming the aqueous solution component

include inorganic oxidizing materials such as sodium salts illustrated by sodium chlorate, and sodium perchlorate; calcium salts illustrated by calcium nitrate, calcium chlorate, and calcium perchlorate; potassium salts illustrated by potassium nitrate, potassium chlorate, and potassium perchlorate; ammonium salts illustrated by ammonium chlorate, and ammonium perchlorate; lithium salts illustrated by lithium nitrate, lithium chlorate, and lithium perchlorate; magnesium salts illustrated by magnesium nitrate, magnesium chlorate and magnesium perchlorate; aluminum salts illustrated by aluminum nitrate, and aluminum chlorate; barium salts illustrated by barium nitrate, barium chlorate, and barium perchlorate; zinc salts illustrated by zinc nitrate, zinc chlorate, and zinc perchlorate; and organic materials illustrated by ethylene-diamine-dichlorate, and ethylene-diamine-diperchlorate; and mixtures of these various additives as well as other emulsion compatible water soluble materials. These water soluble, emulsion compatible materials may be generally added in an amount from 0 to about 55 parts by weight and preferably to about 36 parts by weight as based on 100 parts by weight of ammonium nitrate. As in the case of ammonium nitrate, these materials desirably have a particle size that will pass a No. 8 USS screen to effect rapid formation of the aqueous solution phase.

The aqueous solution component of the present emulsion system may be formed by heating the water with the ammonium nitrate and when included, the water soluble emulsion compatible material until a solution is formed. Heating to form the aqueous solution component may be at a temperature of about 110° F. to about 120° F. and may be effected prior to or during formation of the finally prepared emulsion. Regardless of how the solution is formed, when the aqueous solution component is dispersed to form the discontinuous emulsion phase, it is generally desirable for optimum explosive properties that the water soluble materials form a saturated aqueous solution with excess solid water soluble materials dispersed therein such that a crystalline phase appears in the finally prepared emulsion when detonated.

The crystalline phase of the present emulsion generally results on cooling the finally prepared emulsion and appears in the aqueous solution component when at a temperature of about 70° F. and desirably at that temperature at which the emulsion may normally be detonated. It is generally found that the presence of crystals in the aqueous solution component increases the effective blasting potential of the present emulsion system.

Soluble carbohydrate materials exemplified by mannose, glucose, sucrose, fructose, maltose, and molasses may be added to the aqueous component to serve as supplemental fuels if desired. Other related water soluble fuels may also be similarly added to the aqueous solution component.

A second component of the present emulsion system is a carbonaceous fuel component forming a continuous or external emulsion phase and in a preferred embodiment, characterized with a gas occlusion temperature between about 70° F. and about 190° F. and preferably with a gas occlusion temperature between about 95° F. and about 130° F. Such a carbonaceous fuel component is broadly defined as one of the type which is non-water soluble and forms a water-in-oil type emulsion with the aqueous solution component when a water-in-oil type emulsifying agent is present.

The gas occlusion temperature may be defined as a temperature at which the emulsion system, when substantially free of occluded gas at a temperature above 70° F., will demonstrate the ability to occlude gas when cooled and agitated. The gas occlusion temperature may also be defined as that temperature below which gas or atmospheric air will become entrapped within the emulsion system as evidenced by a sudden decrease in the density of the emulsion-occluded gas system. Conversely, the gas occlusion temperature is that temperature at which an aerated emulsion of low density, upon heating to a temperature above about 70° F., will lose occluded

gas to the atmosphere when the emulsion-occluded gas system is agitated in some manner to expose new surfaces of the emulsion to the atmosphere. Deaeration as described is accompanied by a sudden increase in the density of the emulsion-occluded gas system.

The consistency of the carbonaceous fuel component for the external emulsion phase is usually important for retention of the occluded gas component which is necessary to provide the desired sensitivity in the product emulsion. If the consistency at ambient use and storage conditions is too thin, the occluded gas component will tend to agglomerate or will be expelled from the emulsion. On the other hand, the carbonaceous fuel component used must be sufficiently fluid at manufacturing temperatures to permit formation of the emulsion. Thus, although the finally prepared emulsion may have a solid or near solid external phase, it appears usually necessary that the external emulsion phase be liquid or sufficiently fluid when the emulsion is prepared in the first instance. The carbonaceous fuel component should therefore have the ability to provide this desired consistency differential with variations in temperature.

It is generally found that when the gas acculsion temperature is lowered to below about 70° F., the prepared emulsion will either experience a tendency to lose occluded gas in normal storage and use, or the occluded gas will tend to agglomerate resulting in a product having decreased blasting potential. It is recognized, however, that such emulsions may be prepared with occluded gas provided the storage and use temperatures are maintained very low, i.e., substantially below about 70° F.

It is also generally found that gas occlusion temperatures below about 190° F. are most useful for preparing the present emulsion as it is generally desirable from a convenience stand-point to work with water emulsions at temperatures below the boiling point thereof. The preferred gas occlusion temperature in the range of about 95° F. to about 130° F., therefore avoids both

gas agglomeration in normal storage and use and is most practical for commercially preparing the present emulsion blasting composition.

The carbonaceous fuel material selected for use in the present emulsion system will generally depend upon the physical form desired in the final product. The firmness of the emulsion system may be varied depending on which carbonaceous fuel material is used and especially upon the physical consistency of the fuel. The carbonaceous fuel material selected is also found to influence the explosive characteristics of the prepared product since the occluded gas component is primarily retained in the fuel component as a discontinuous phase of the emulsion system.

The carbonaceous fuel component preferably includes an all wax component, a wax and an oil component, a wax and a polymeric material component, or a wax and a polymeric modified oil component. The fuel component may thus include hydrocarbons whether paraffinic, olefinic, naphthenic, aromatic, saturated or unsaturated and which are suitable for use as the fuel component.

Waxes which may be used in the carbonaceous fuel component include waxes derived from petroleum such as petrolatum wax, microcrystalline wax, and paraffin wax; mineral waxes such as ozocerite, and montan wax; animal waxes such as spermacetic; and insect waxes such as beeswax, and Chinese wax. The most desirable waxes are those which have melting points of at least 80° F. and which are readily compatible with the formed emulsion. Preferably, these waxes have a melting point in the range of about 100° F. to about 160° F.

With the addition of any given amount of wax in the carbonaceous fuel component, the thickening effect produced may be that of the wax plus a wax modifier such as a viscous oil or polymeric material. It is found that a quantity of at least about 2% and preferably at least about 5% by weight of the carbonaceous fuel component should desirably constitute wax or insufficient oc-

clusion of gas results in the finally prepared emulsion.

A petroleum oil of any desired viscosity may be used as a component of the carbonaceous fuel and may include oils having viscosities varying from a thin liquid to those which are so thick that they do not flow at ordinary temperatures. Brookfield viscosities at 85° F. for typical petroleum oils appear in the range of about 160 to about 5,000 centipoises and preferably to about 3,100 centipoises.

Non-volatile, water-insoluble polymeric or elastomeric materials of the group consisting of natural rubber, synthetic rubber and polyisobutylene may be included in the carbonaceous fuel component of the present emulsion. Copolymers of butadiene-styrene, copolymers of isoprene-isobutylene, or copolymers of isobutylene-ethylene and copolymers of related materials as well as terpolymers thereof may also be usefully employed to modify the fuel component and improve same in retaining occluded gas over a prolonged period of time. Other polymeric materials may also be employed for this purpose as desired.

The carbonaceous fuel component is generally added in an amount from about 4 to about 45 parts by weight per 100 parts by weight of ammonium nitrate. In the preferred embodiment, the carbonaceous fuel component is added in an amount of about 5 to about 17 parts by weight per 100 parts by weight of ammonium nitrate.

Supplementary fuels such as saturated fatty acids, higher alcohols having a chain length of at least about 6 to more than about 18 carbon atoms, and the like may be found suitable for use in the carbonaceous fuel component of the emulsion system.

Supplementary fuels of the saturated fatty acid type which are suitable for use in the carbonaceous fuel component include octanoic acid, decanoic acid, lauric acid, palmitic acid, behenic acid and stearic acid.

Supplementary fuels of the higher alcohol type which are suitable for use in the carbonaceous fuel component include hexyl alcohol, nonyl alcohol, lauryl alcohol, cetyl alcohol and stearyl alcohol.

Other immiscible, carbonaceous materials useful as supplementary fuels in the carbonaceous fuel component include the vegetable oils such as corn oil, cottonseed oil and soybean oil.

The present emulsion system may also include as an optional fuel ingredient a finely divided non-water soluble solid particulate fuel such as carbon, coal, graphite, sulfur, or the like, or it may contain a metallic powder which serves as a fuel such as aluminum, magnesium or related alloys thereof.

Other additives may be included in the carbonaceous fuel component, as desired, provided that this component retains the ability to form a water-in-oil type emulsion and, in the preferred modification, is characterized with a gas occlusion temperature of at least about 70° F. to about 190° F.

A third component of the present emulsion system is an occluded gas component forming a discontinuous emulsion phase. Sufficient gas, generally air, is introduced into the present emulsion system by any suitable means such as by using a gas inducing mixer, or by direct introduction of gas into the emulsion which is then subsequently blended. An example of a gas inducing mixer is a ribbon-type mixer, whereas the Votator scraped surface heat exchanger type unit by Girdler Company, Louisville, Kentucky, exemplifies suitable means for combining directly introduced gas with the emulsion.

The gas component is desirably added during cooling of the emulsion to a temperature below the gas occlusion temperature such that the prepared emulsion containing the four principal components retains from about 4% to about 47% by volume of gas at 70° F. and atmospheric pressure. Preferably, this emulsion retains from about 13% to about 33% by volume of gas at 70° F. and atmospheric pressure.

If desired, the various non-gas components being processed may be heated to drive off entrapped gas. By having an

entrapped gas-free system during the pre-blending or blending stages in preparation of the present emulsion, a standardized composition results into which an exact amount of gas may be added to achieve a pre-determined density, and thereby avoid wide variance in densities of the prepared composition.

The present emulsion system contains as a fourth component, a water-in-oil type surfactant or emulsifying agent in an amount of about 0.75 part to about 5 parts by weight per 100 parts by weight of ammonium nitrate and in the preferred embodiment, from about 1.3 parts to about 3 parts by weight per 100 parts by weight of ammonium nitrate. Additional amounts of emulsifying agent may be added, if desired, since the surplus emulsifying agent may serve as a supplemental fuel for the blasting composition.

Suitable emulsifying agents found useful herein are the water-in-oil type and include those derivable from sorbitol by esterification with removal of one molecule of water. Such sorbitan emulsifying agents may include sorbitan fatty acid esters such as sorbitan monolaurate, sorbitan monooleate, sorbitan monopalmitate, sorbitan monostearate and sorbitan tristearate. The mono- and glycerides of fat-forming fatty acids are also useful as water-in-oil type emulsifying agents.

Other water-in-oil type emulsifying agents which may be used include polyoxyethylene sorbitol esters such as the polyoxyethylene sorbitol beeswax derivative materials. Water-in-oil type emulsifying agents such as the isopropyl ester of lanolin fatty acids may also prove useful as may mixtures of higher molecular fatty alcohols and wax esters. Various other specific examples of water-in-oil type emulsifying agents include polyoxyethylene (4) lauryl ether, polyoxyethylene (2) oleyl ether, polyoxyethylene (2) stearyl ether, polyoxyalkylene oleyl/laurate, oleyl acid phosphate, substituted oxazolines and phosphate esters, to mention but a few. Mixtures of these various emulsifying agents

as well as other water-in-oil type emulsifying agents may also prove useful.

The pH of the present emulsion system is generally either equivalent to or incident to the pH of the aqueous solution component taken either as aqueous ammonium nitrate solution, as the water soluble emulsion compatible oxidizer material in solution, or a combination thereof. Generally, the pH of the prepared emulsion is between about 2 and about 8, and preferably about 3.5 and about 7. When emulsions are prepared above pH 8, it is found that ammonium nitrate decomposes in the emulsion and when emulsions are prepared more acidic than pH 2, acid corrosive problems are encountered.

The present emulsion system may be prepared by combining the water with the ammonium nitrate and when included, the water soluble emulsion compatible oxidizer material to form an aqueous solution thereof. Conveniently, the aqueous solution may be rapidly effected by heating the water. Alternately, the aqueous solution component may result by simply combining all the materials in a container and heating same during formation of the emulsion. Other variations in preparing the aqueous solution component are also possible and may be employed.

The carbonaceous fuel component of the present emulsion may be prepared by combining the various fuel components and the emulsifying agent or these materials may be separately added and combined during formation of the emulsion.

When the aqueous solution component and the carbonaceous fuel component are separately prepared, they are combined to form an emulsion by any suitable mixing system which occludes sufficient quantities of the gas component into the emulsion. Alternately, the emulsion may be prepared by simple addition of the various components to a mixer with either little or no occlusion of gas. The gas is then occluded by a separate step after the emulsion is prepared.

The present emulsion is preferably formed from an external emulsion phase

material having a consistency sufficiently thin for emulsion formation above the gas occlusion temperature. Thereafter, the consistency is thickened by cooling so that the occluded gas may be retained. Thus, a carbonaceous fuel component forming the external emulsion phase appears in liquid form at emulsion preparation temperatures and as a paste or solid form at either storage or use temperatures.

It is desirable for the preferred embodiment of the present invention that the fuel component and the aqueous solution component be processed at a temperature either at or above the gas occlusion temperature. It is also found desirable that the materials in the aqueous solution component be in solution during formation of the emulsion. This will insure that the crystalline phase appear dispersed within the aqueous solution phase when the emulsion is cooled to a temperature below the solution saturation point. Thus, the crystalline phase should appear in the aqueous solution phase of the prepared emulsion when the emulsion temperature is about 70° F. and desirably at that temperature at which the emulsion may normally be detonated.

The temperature of emulsion formation as well as the gas occlusion temperature varies depending upon the materials being processed. It is generally found in the preferred embodiment that the temperature of emulsion formation is within the range of about 100° F. to about 135° F. and the gas occlusion temperature is within the range of about 95° F. to about 130° F.

In combining the components in one process of the present invention, it has been found that greater uniformity of the emulsion on storage may be obtained if the temperature during the mixing or emulsification step is kept above the melting point of the fuel blend, that is, from about 100° F. to about 160° F. However, the process of this invention may be performed outside these temperature limits, if desired.

The preferred process of the present invention generally involves forming an emulsion system by separately mixing the aqueous solution component with the carbonaceous fuel component containing a water-in-oil type emulsifying agent and other materials as may be desired. This preferred process is generally performed with heating and mixing, of the components at a temperature above the gas occlusion temperature. After the components have been combined to a substantially uniform consistency, the temperature is gradually lowered to the gas occlusion temperature with continued mixing. A sudden decrease in density is experienced about the gas occlusion temperature and after the requisite amount of gas has been occluded into the emulsion, the temperature may be lowered at any desired rate without further mixing. Should it be found that insufficient gas has been occluded into the emulsion, then the emulsion may be heated to the gas occlusion temperature for introduction of additional quantities of gas as desired.

Many variations exist for introducing the occluded gas component into the emulsion system. The most common method consists of simply mixing the emulsion in an open vessel. However, gas may be introduced by bubbling gas through an orifice, by the use of injectors, or by various other mechanical means. Chemical generation of gas in the emulsion is also possible. It is also noted that although the occluded gas is generally air, other gases may be used such as gaseous hydrocarbons, nitrous oxide, nitrogen, carbon dioxide, substantially pure oxygen, or the like.

In order to further illustrate the present invention, the following examples are given wherein all parts are by weight unless otherwise indicated:

## EXAMPLE 1

An emulsion type blasting agent is prepared by combining as a wax component, 2.3 parts by weight of a friable oil-soluble crystalline wax having a melting point of about 121–125° F. and identified by the trademark Atlantic 342 by the Atlantic Refining Co.; as an oil component, 5.4 parts by weight of a highly refined mineral oil identified by the trademark Atreol 34 also by the Atlantic Refining Co.; 5 parts by

weight of a water-in-oil type emulsifying agent formed of mono- and diglycerides of fat forming fatty acids and identified by the trademark Atmos 300 by Atlas Chemical Industries, Inc.; 100 parts by weight of ammonium nitrate; 15 parts by weight of sodium nitrate and 28 parts by weight of water. These various materials are combined in a water jacketed mixer. Heat is applied to the mixer until the temperature of emulsion formation of about 114° F. is passed. Thereafter, the ingredients are actively mixed to form an emulsion of substantially uniform consistency. The prepared emulsion is slowly cooled to a gas occlusion temperature found to be 114° F. at which a sudden drop in density is noted during which time air is occluded into the emulsion by continued mixing in the open vessel. The temperature is continuously lowered to about 110° F. at which temperature mixing is stopped. The finally prepared emulsion, upon further cooling is found to have about 13.9% by volume, at 70° F. and atmospheric pressure, of occluded air a density of about 1.18 gms./cc. at 70° F. and a pH 4. At 70° F., the prepared emulsion is found to have a very soft character and when detonated by a 3″ × 3″ cartridge of high velocity gelatin dynamite initiated by a No. 6 standard electric blasting cap after emulsion storage for 28 days at a temperature of about 70° F. is found to have a 3″ × 12″ cartridge detonation velocity of about 14,700 ft./sec.

### EXAMPLE 2

An emulsion blasting agent is prepared by combining 2.4 parts by weight of the wax component of Example 1, 5.6 parts by weight of the oil component of Example 1, 3 parts by weight of a water-in-oil type emulsifying agent formed of oleyl acid phosphate, 100 parts by weight of ammonium nitrate, 16 parts by weight of sodium nitrate, and 29 parts by weight of water. In addition, 2 parts by weight of hollow, finely divided, low-density particles of glass identified by the trademark Micro-balloon by the Standard Oil Co. of Ohio is included as gas retaining particles. These various materials are combined according to the procedure of Example 1. The emulsion is found to have an emulsion formation temperature of about 114° F. and a gas occlusion temperature of 114° F. The prepared emulsion is also found to have about 14.2% by volume of occluded air at 70° F. and atmospheric pressure, a density of about 1.15 gms./cc. at 70° F. and a pH 4. At 70° F., the prepared emulsion is found to have a soft character and when detonated by a 3″ × 3″ cartridge of high velocity gelatin dynamite initiated by a No. 6 standard electric blasting cap after emulsion storage for 28 days at a temperature of about 70° F., is found to have a 3″ × 12″ cartridge detonation velocity of about 16,400 ft./sec.

### EXAMPLE 3

An emulsion blasting agent is prepared by combining as a wax component, 3.4 parts by weight of a modified, highly cohesive microcrystalline wax having a melting point of about 114–119° F. and identified by the trademark Indra 2119 by Industrial Raw Materials Corp.; as an oil component, 3.4 parts by weight of a polymer modified, high viscosity lubricating oil identified by the trademark Molol-B by Witco Chemical Company, Inc.; 1.4 parts by weight of a water-in-oil type emulsifying agent formed of polyoxyethylene(2)oleyl ether and identified by the trademark Brij 92 by Atlas Chemical Industries, Inc.; 100 parts by weight of ammonium nitrate; and 27 parts by weight of water. The wax component and oil component are separately combined after which the water-in-oil emulsifying agent is added. The ammonium nitrate and water are separately combined. These two component mixtures are then formed into an emulsion at a temperature above the saturation temperature for the ammonium nitrate solution and according to the mixing procedure of Example 1. The emulsion is found to have an emulsion formation temperature of about 115° F. and a gas occlusion temperature of about 111° F. The prepared emulsion is also found to have about 7.7% by volume of occluded air at 70° F. and atmospheric pressure, a density of about 1.35 gms./cc. at 70° F. and a

pH 5. At 70° F., the prepared emulsion is found to have a firm character and when detonated by a 3″ × 3″ cartridge of high velocity gelatin dynamite initiated by a No. 6 standard electric blasting cap after emulsion storage for 28 days at a temperature of about 70° F., is found to have a 3″ × 12″ cartridge detonation velocity of about 14,900 ft./sec.

### EXAMPLE 4

An emulsion blasting agent is prepared by combining 9.7 parts by weight of the wax component of Example 3, 1.8 parts by weight of a water-in-oil type emulsifying agent formed of sorbitan monooleate, 100 parts by weight of ammonium nitrate, 31 parts by weight of potassium nitrate, 35 parts by weight of water, and 20 parts by weight of finely divided carbon. These various ingredients are combined to form an emulsion according to the mixing procedure of Example 1. The emulsion is found to have an emulsion formation temperature of about 121° F. and a gas occlusion temperature of about 110° F. The prepared emulsion is also found to have about 19% by volume of occluded air at 70° F. and atmospheric pressure, a density of about 1.17 gms./cc. at 70° F. and a pH 5. At 70° F., the prepared emulsion is found to have a soft character and when detonated by 3″ × 3″ cartridge of high velocity gelatin dynamite initiated by a No. 6 standard electric blasting cap after emulsion storage for 28 days at a temperature of about 70° F., is found to have 3″ x 12″ cartridge detonation velocity of about 17,400 ft./sec.

### EXAMPLE 5

A series of emulsion blasting agents are prepared by the procedure of Example 1, each having one of the following water-in-oil type emulsifying agents substituted for Atmos 300, sorbitan monolaurate, sorbitan monooleate, sorbitan monopalmitate, sorbitan monostearate and sorbitan tristearate. The emulsions are found to have emulsion formation temperatures of about 114° F.–116° F. and gas occlusion temperature of about 114° F. The prepared emulsions are also found to have about 15.3% to about 19.7% by volume of occluded air at 70° F. and atmospheric pressure, densities of about 1.10–1.16 gms./cc. at 60° F. and pH's about pH 4 to about pH 5. At 70° F., the prepared emulsions are found to have very soft to soft character and when each is detonated by a 3″ × 3″ cartridge of high velocity gelatin dynamite initiated by a No. 6 standard electric blasting cap after emulsion storage for 28 days at 70° F., are found to have 3″ × 12″ cartridge detonation velocities of about 13,900 ft./sec. to about 14,500 ft./sec.

### EXAMPLE 6

An emulsion blasting agent is prepared using the ingredients of Example 1. Initially, a solution is formed by dissolving sodium nitrate and ammonium nitrate in water. Thereafter, a carbonaceous fuel component is prepared with the wax and oil components to which is added the water-in-oil emulsifying agent. The carbonaceous fuel component, at a temperature above the aqueous solution temperature, is stirred until a substantially uniform consistency is obtained. Thereafter, the prepared aqueous solution component and the carbonaceous fuel component, while both at a temperature above the saturation temperature for the aqueous solution, are blended with stirring and heating to a temperature above the emulsion formation temperature of about 114° F. The prepared emulsion is slowly cooled to a gas occlusion temperature found to be 114° F. at which a sudden drop in density is noted during which time air is occluded into the emulsion by continued mixing in the open vessel. The temperature is continuously lowered to about 110° F. at which temperature mixing is stopped. The finally prepared emulsion upon further cooling is found to have about 12.4% by volume of occluded air at 70° F. and atmospheric pressure, a density of about 1.20 gms./cc. at 70° F. and a pH 4. At 70° F., the prepared emulsion is found to have a very soft character and when detonated by a 3″ × 3″ cartridge of high velocity gelatin dynamite initiated by a No.

6 standard electric blasting cap after emulsion storage for 28 days at a temperature of about 70° F., is found to have 3″ × 12″ cartridge detonation velocity of about 15,-500 ft./sec.

### EXAMPLE 7

An emulsion blasting agent is prepared by the procedure of Example 1, having an emulsifying agent formed of high molecular weight cationic polymeric fatty amine and identified by the trademark G–3570 by Atlas Chemical Industries, Inc. substituted for Atmos 300. The emulsion is found to have an emulsion formation temperature of about 114° F. and a gas occlusion temperature of about 114° F. The prepared emulsion is also found to have about 14% by volume of occluded gas at 70° F. and atmospheric pressure, a density of about 1.18 gms./cc. at 70° F. and pH about 6.5. At 70° F., the prepared emulsion is found to have a soft character and when detonated by a 3″ × 3″ cartridge of high velocity gelatin dynamite initiated by a No. 6 standard electric blasting cap after emulsion storage for 28 days at 70° F., is found to have a 3″ × 12″ cartridge detonation velocity of about 14,000 ft./sec.

### EXAMPLE 8

An emulsion blasting agent is prepared by combining 9.1 parts by weight of a viscous motor oil identified as RM–8670 by Industrial Raw Materials Corp., 1.8 parts by weight of the water-in-oil type emulsifying agent of Example 1, 100 parts by weight of ammonium nitrate, 29.1 parts by weight of sodium nitrate, and 36.4 parts by weight of water. In addition, 5.5 parts by weight of hollow, finely divided, low-density particles of glass identified by the trademark Microballoons by the Standard Oil Co. of Ohio is included as gas retaining particles. These various materials are combined according to the procedure of Example 1. The emulsion is found to have an emulsion formation temperature of about 106° F. and a consistency at 70° F. such that the gas entraining particles are held substantially uniformly throughout the prepared emulsion. The prepared emulsion is also found to have a density of about 1.15 gms./cc. at 70° F. and a pH 4. At 70° F., the prepared emulsion is found to have a very soft character and when detonated by a 3″ × 3″ cartridge of high velocity gelatin dynamite initiated by a No. 6 standard electric blasting cap after emulsion storage for 28 days at a temperature of about 70° F., is found to have a 3″ × 12″ cartridge detonation velocity of about 16,-400 ft./sec.

### EXAMPLE 9

An emulsion blasting agent is prepared by combining as a wax component, 3.4 parts by weight of a modified, highly cohesive microcrystalline wax having a melting point of about 118–122° F. and identified by the trademark Indra 2126 by Industrial Raw Materials Corp.; as an oil component, 3.4 parts by weight of Atreol 34 of Example 1; 1.4 parts by weight of sorbitan monooleate water-in-oil type emulsifying agent; 100 parts by weight of ammonium nitrate; and 27 parts by weight of water. The wax component and oil component are separately combined after which the water-in-oil emulsifying agent is added. The ammonium nitrate and water are separately combined. These two component mixtures are then formed into an emulsion and mixed at a temperature above the saturation temperature for the ammonium nitrate solution and according to the mixing procedure of Example 1. The emulsion is found to have an emulsion formation temperature of about 113° F., a gas occlusion temperature of about 112° F., and about 12.3% by volume of occluded air at 70° F. and atmospheric pressure. The prepared emulsion is found to have a density of about 1.14 gms./cc. at 70° F. and a pH 4.5. The emulsion is also found to have a firm character and when detonated by a 3″ × 3″ cartridge of high volocity gelatin dynamite initiated by a No. 6 standard electric blasting cap after emulsion storage for 28 days at a temperature of about 70° F., is found to have a 3″ × 12″ cartridge detonation velocity of about 17,300 ft./sec.

## EXAMPLE 10

An emulsion blasting agent is prepared by combining as a wax component, 3.5 parts by weight of a modified, highly cohesive microcrystalline wax having a melting point of about 114–119° F. and identified by the trademark Indra 2119 by Industrial Raw Materials Corp.; 5.3 parts by weight of DNT; 1.4 parts by weight of sorbitan monooleate water-in-oil type emulsifying agent; 29.7 parts by weight of sodium nitrate; 100 parts by weight of ammonium nitrate; and 35 parts by weight of water. The wax component and DNT component are separately combined after which the water-in-oil emulsifying agent is added. The ammonium nitrate, sodium nitrate and water are separately combined and mixed. These two component mixtures are then formed into an emulsion at a temperature above the saturation temperature for the ammonium nitrate-sodium nitrate solution and according to the mixing procedure of Example 1. The emulsion is found to have an emulsion formation temperature of about 114° F. and a gas occlusion temperature of about 112° F. The prepared emulsion is also found to have about 19.6% by volume of occluded air at 70° F. and atmospheric pressure, a density of about 1.15 gms./cc. at 70° F. and a pH 5. At 70° F., the prepared emulsion is found to have a firm character and when detonated by a 3″ × 3″ cartridge of high velocity gelatin dynamite initiated by a No. 6 standad electric blasting cap after emulsion storage for 28 days at a temperature of about 70° F., is found to have a 4″ × 12″ cartridge detonation velocity of about 16,600 ft./sec.

## EXAMPLE 11

An emulsion blasting agent is prepared by combining as a wax component, 4.4 parts by weight of a modified, highly cohesive microcrystalline wax having a melting point of about 118–122° F, and identified by the trademark Indra 2126 by Industrial Raw Materials Corp.; as an oil component, 4.4 parts by weight of Atreol 34 of Example 1; 1.8 parts by weight of sorbitan monooleate water-in-oil type emulsifying agent; 15.3 parts by weight of particulate aluminum; 29.9 parts by weight of sodium nitrate; 100 parts by weight of ammonium nitrate; and 35.1 parts by weight of water. The wax, aluminum and oil are separately combined after which the water-in-oil emulsifying agent is added. The ammonium nitrate, sodium nitrate and water are separately combined and mixed. These two component mixtures are then formed into an emulsion at a temperature above the saturation temperature for the ammonium nitrate-sodium nitrate solution and according to the mixing procedure of Example 1. The emulsion is found to have an emulsion formation temperature of about 112° F. and a gas occlusion temperature of about 110° F. The prepared emulsion is also found to have about 22.3% by volume of occluded air at 70° F. and atmospheric pressure, a density of about 1.15 gms./cc. at 70° F. and a pH 6. At 70° F., the prepared emulsion is found to have a firm character and when detonated by a 3″ × 3″ cartridge of high velocity gelatin dynamite initiated by a No. 6 standard electric blasting cap after emulsion storage for 28 days at a temperature of about 70° F., is found to have a 4″ × 12″ cartridge detonation velocity of about 17,700 ft./sec.

## EXAMPLE 12

An emulsion blasting agent is prepared by combining as a wax component, 3.6 parts by weight of a crystalline wax identified by the trademark Atlantic 342; as an oil component, 3.6 parts by weight of Atreol 34; 3.1 parts by weight of sorbitan monooleate water-in-oil type emulsifying agent; 100 parts by weight of ammonium nitrate; 15.4 parts by weight of sodium nitrate and 27.7 parts by weight of water. These various materials are combined in a water jacketed mixer. Heat is applied to the mixer until the temperature of emulsion formation of about 117° F. is passed. Thereafter, the ingredients are actively mixed to substantially uniform consistency. The prepared emulsion is slowly cooled to a gas occlusion temperature found to be 110° F. at which a sudden drop in density is noted during which time air is occluded into

the emulsion by continued mixing in the open vessel. The temperature is continuously lowered to about 101° F. at which temperature mixing is stopped. The finally prepared emulsion, upon further cooling is found to have about 37.1% by volume occluded air at 70° F. and atmospheric pressure, a density of about 0.88 gms./cc. at 70° F. and a pH 4. At 70° F., the prepared emulsion is found to have a very soft character and when detonated by a 3" × 3" cartridge of high velocity gelatin dynamite initiated by the No. 6 standard electric blasting cap after emulsion storage for 28 days at a temperature of about 70° F., if found to have a 3" × 8" cartridge detonation velocity of about 12,280 ft./sec.

## EXAMPLE 13

An emulsion blasting agent is prepared by combining as a wax component, 4.4 parts by weight Indra 2126 wax; 4.4 parts by weight of high molecular weight isobutylene polymer identified by the trademark Paratac by Arkansas Co., Inc.; 1.7 parts by weight of Atmos 300 water-in-oil type emulsifying agent; 100 parts by weight of ammonium nitrate; 29.8 parts by weight of sodium nitrate; and 35 parts by weight of water. The wax component and polymer component are separately combined after which the water-in-oil emulsifying agent is added. The ammonium nitrate, sodium nitrate and water are separately combined and mixed. These two component mixtures are then formed into an emulsion at a temperature above the saturation temperature for the ammonium nitrate-sodium nitrate solution and according to the mixing procedure of Example 1. The emulsion is found to have an emulsion formation temperature of about 118° F. and a gas occlusion temperature of about 112° F. The prepared emulsion is also found to have about 17.1% by volume of occluded air at 70° F. and atmospheric pressure, a density of about 1.16 gms./cc. at 70° F. and a pH 5. At 70° F., the prepared emulsion is found to have a firm character and when detonated by a 3" × 3" cartridge of high velocity gelatin dynamite initiated by a No. 6 standard electric blasting cap after emulsion

storage for 28 days at a temperature of about 70° F., is found to have a 3" × 12" cartridge detonation velocity of about 16,-200 ft./sec.

## EXAMPLE 14

An emulsion blasting agent is prepared by combining as a wax component, 5.2 parts by weight of a modified, highly cohesive microcrystalline wax having a melting point of about 114–119° F. and identified by the trademark Indra 2119 by Industrial Raw Materials Corp.; as an oil component, 3.4 parts by weight of bunker fuel oil; 1.7 parts by weight of Atmos 300 water-in-oil type emulsifying agent; 100 parts by weight of ammonium nitrate; 31 parts by weight of sodium nitrate; and 31 parts by weight of water. The wax component and oil component are separately combined after which the water-in-oil emulsifying agent is added. The ammonium nitrate, sodium nitrate and water are separately combined and mixed. These two component mixtures are then formed into an emulsion at a temperature above the saturation temperature for the ammonium nitrate-sodium nitrate solution and according to the mixing procedure of Example 1. The emulsion is found to have an emulsion formation temperature of about 107° F. and a gas occlusion temperature of about 104° F. The prepared emulsion is also found to have about 16.9% by volume of occluded air at 70° F. and atmospheric pressure, a density of about 1.23 gms./cc. at 70° F. and a pH 5. At 70° F., the prepared emulsion is found to have a firm character and when detonated by a 3" × 3" cartridge of high velocity gelatin dynamite initiated by a No. 6 standard electric blasting cap after emulsion storage for 28 days at a temperature of about 70° F., is found to have 3" × 12" cartridge detonation velocity of about 15,820 ft./sec.

The sensitivity and detonation velocity of the present emulsion usually may be modified by addition of gas entraining particles of a size that will at least pass through a No. 8 USS screen such as, for example, microspheres formed of resinous materials,

or hollow glass balls. Generally, about 1 part by weight of the gas entraining particles based on 100 parts by weight of ammonium nitrate is required to obtain an advantage and usually more than about 70 parts by weight per 100 parts by weight of ammonium nitrate fail to yield further advantage or improvement.

The gas entraining particles may be substituted in total or in part for the occluded air component. When the gas entraining particles are substituted in total for the occluded air component, it is necessary that the carbonaceous fuel component have a consistency such that the gas entraining particles be held substantially uniformally throughout the prepared emulsion when at normal use temperatures, i.e., about 70° F. It is recognized that the consistency of the carbonaceous fuel component in this instance may be thinner for holding the gas entraining particles than in the case when gas component is simply occluded in the emulsion. Generally because of the greater cost of these gas entraining particles as compared to air, it is desirable to include such particles in the present emulsion only as a supplemental material.

Preferably, the amounts of the principal components added to form the present emulsion are adjusted within the range specified to yield a mobile emulsion which has approximately an oxygen balance of about $\pm 10$ percent. When an amount of finely divided solid fuel such as coal or aluminum is added, the oxygen balance of the emulsion may be as low as –20 percent and the finally prepared emulsion containing optional additives is preferably within the oxygen balance range of $\pm 10$ percent.

The present emulsion is ordinarily detonated with the aid of a booster charge, and is thus non-cap sensitive to a standard No. 8 blasting cap when the emulsion is prepared with occluded air to a density of about 0.90 gms./cc. to about 1.40 gms./cc. at about 70° F. A standard No. 8 blasting cap generally possesses the explosive equivalent of about 2.00 grams of mercury fulminate.

The present emulsion are insensitive to usual mechanical shock and are capable of performing as powerful explosives but do not contain, unless optionally added, a sensitive high explosive material such as TNT and nitroparaffins. Materials such as DNT may also be optionally added if desired.

The present emulsion when prepared with occluded gas in the density range above 0.90 gm./cc. at about 70° F. may be safely manufactured, stored and shipped, and may be prepared in a processing plant and transported to the blasting site. Alternatively, the present emulsion may be prepared at the site in a mobile unit.

The explosive velocity of the presently prepared blasting agents is generally in the range of about 13,000 ft./sec. to about 20,000 ft./sec. Higher and lower explosive velocities may be prepared as desired by altering either the density or composition of the prepared emulsion.

It is understood that the foregoing detailed description is given merely by way of illustration and that many variations may be made therein without departing from the spirit of this invention.

What is claimed is:

1. An emulsion blasting agent consisting essentially of an aqueous solution of ammonium nitrate forming a discontinuous emulsion phase;

a carbonaceous fuel forming a continuous emulsion phase;

an occluded gas dispersed within said emulsion and comprising at least 4% by volume, thereof at 70° F. and atmospheric pressure; and

a water-in-oil type emulsifying agent;

said carbonaceous fuel having a consistency such that said occluded gas is held in said emulsion at a temperature of 70° F.

2. The blasting agent of claim 1 wherein said occluded gas is substantially uniformly dispersed within said emulsion in gas entraining particles.

3. The blasting agent of claim 1 wherein said prepared blasting agent has a stabil-

ity for at least 28 days at 70° F. storage temperature.

4. The blasting agent of claim 1 wherein:

said aqueous solution is formed of:

 (a) 100 parts by weight of ammonium nitrate;

 (b) about 10 to about 60 parts by weight of water;

 (c) up to about 55 parts by weight of at least a second water soluble, emulsion compatible oxidizing material in addition to said ammonium nitrate;

said carbonaceous fuel is present in an amount from about 4 to about 45 parts by weight;

said occluded gas is present in an amount from about 4% to about 47% by volume of said emulsion at 70° F. and atmospheric pressure; and

said water-in-oil type emulsifying agent is present in an amount from about 0.75 to about 5 parts by weight.

5. The blasting agent of claim 1 wherein:

said aqueous solution is formed of:

 (a) 100 parts by weight of ammonium nitrate;

 (b) about 18 to about 44 parts by weight of water;

 (c) up to about 36 parts by weight of at least a second water soluble, emulsion compatible oxidizing material in addition to said ammonium nitrate;

said carbonaceous fuel is present in an amount from about 5 to about 17 parts by weight;

said occluded gas is present in an amount from about 13% to about 33% by volume of said emulsion at 70° F. and atmospheric pressure; and

said water-in-oil type emulsifying agent is present in an amount from about 1.3 to about 3 parts by weight.

6. The blasting agent of claim 1 wherein ammonium nitrate in crystalline phase is present within the aqueous solution when said solution is at a temperature of 70° F.

7. The blasting agent of claim 4 wherein the water soluble, emulsion compatible oxidizing material is selected from the group consisting of sodium nitrate, sodium chlorate, sodium perchlorate, calcium nitrate, calcium chlorate, calcium perchlorate, potassium nitrate, potassium chlorate, potassium perchlorate, ammonium chlorate, ammonium perchlorate, lithium nitrate, lithium chlorate, lithium perchlorate, magnesium nitrate, magnesium chlorate, magnesium perchlorate, aluminum nitrate, aluminum chlorate, barium nitrate, barium chlorate, barium perchlorate, zinc nitrate, zinc chlorate, zinc perchlorate, ethylene-diamine-dichlorate and ethylene-diamine-diperchlorate.

8. The blasting agent of claim 1 wherein at least 2% by weight of the carbonaceous fuel is a wax having a melting point above about 80° F.

9. The blasting agent of claim 8 wherein a petroleum oil is included in combination with the wax in the fuel phase.

10. The blasting agent of claim 8 wherein a tackifying polymeric material is included in combination with the wax in the fuel phase.

11. The blasting agent of claim 8 wherein the wax is selected from the group consisting of microcrystalline wax, and paraffin wax having a melting point of about 100° F. to about 160° F.

12. The blasting agent of claim 1 wherein a supplementary fuel is included.

13. The blasting agent of claim 1 wherein a non-water soluble solid particulate fuel is included.

14. The blasting agent of claim 13 wherein the non-water soluble particulate fuel is carbon, coal, aluminum, or magnesium.

15. The blasting agent of claim 1 wherein the water-in-oil type emulsifying agent is a sorbitan fatty acid ester selected from the group consisting of sorbitan monolaurate, sorbitan monooleate, sorbitan monopalmitate, sorbitan monostearate, sorbitan tristearate, and a mono- or diglyceride of a fat-forming fatty acid.

16. The blasting agent of claim 4 wherein about 1 to about 70 parts by weight of gas entraining particles are included.

17. The blasting agent of claim 16 wherein the gas entraining particles are glass microspheres having a particle size that will at least pass through a No. 8 USS screen.

18. A process for preparing an emulsion blasting agent which comprises:

(A) preparing with a water-in-oil type emulsifying agent an emulsion of:

(1) an aqueous ammonium nitrate solution as a discontinuous emulsion phase, and

(2) a liquid carbonaceous fuel as a continuous emulsion phase;

(B) thickening by cooling said liquid carbonaceous fuel to a consistency such that a gas may be occluded therein; and

(C) occluding at least 4% by volume at 70° F. and atmospheric pressure of a gas in the thickened emulsion.

19. The process of claim 18 wherein said aqueous solution has a pH in the range from about 2 to about 8.

20. The process of claim 18 wherein the occluded gas constitutes from about 4% to about 47% by volume at 70° F. and atmospheric pressure of the thickened emulsion.

21. The process of claim 18 wherein the occluded gas constitutes from about 13% to about 33% by volume at 70° F. and atmospheric pressure of the thickened emulsion.

22. The process of claim 18 wherein the emulsion is formed of:

(a) 100 parts by weight of ammonium nitrate;

(b) about 10 parts to about 60 parts by weight of water;

(c) up to about 55 parts by weight of at least a second water soluble, emulsion compatible oxidizing material in addition to said ammonium nitrate;

(d) about 4 parts to about 45 parts by weight of a carbonaceous fuel; and

(e) about 0.75 part to about 5 parts by weight of a water-in-oil type emulsifying agent.

23. The process of claim 18 wherein the temperature of emulsion formation for the mixed components is about 100° F. to about 120° F.

24. The process of claim 18 wherein the gas is occluded in the emulsion at a temperature of about 70° F. to about 190° F.

25. The process of claim 18 wherein the emulsion is formed of:

(a) an aqueous solution of 100 parts by weight of ammonium nitrate, and up to about 36 parts by weight of at least a second water soluble, emulsion compatible oxidizing material in addition to said ammonium nitrate, dispersed in from about 18 parts to about 44 parts by weight of water; and

(b) a carbonaceous fuel of about 5 parts to about 17 parts by weight of a carbonaceous fuel having a gas occlusion temperature from about 95° F. to about 130° F.; and

(c) about 1.3 part to about 3 parts by weight of a water-in-oil type emulsifying agent.

26. The process of claim 25 wherein said second water soluble, emulsion compatible oxidizing material is sodium nitrate.

27. The process of claim 22 wherein the fuel includes at least 2% by weight of wax having a melting point about 100° F. to about 160° F.

28. The process of claim 27 wherein a tackifying polymeric material is included in combination with the wax in the fuel phase.

29. The process of claim 22 wherein the water-in-oil type emulsifying agent is a sorbitan fatty acid ester selected from the group consisting of sorbitan monolaurate, sorbitan monooleate, sorbitan monopalmitate, sorbitan tristearate.

30. The process of claim 22 wherein gas entraining particles having a particle size that will at least pass through a No. 8 USS screen are included in an amount from about 1 to about 70 parts by weight.

References Cited

UNITED STATES PATENTS

3,164,503 1/1965 Gehrig _____149—60 X
3,212,944 10/1965 Lyon et al. _____149—46 X
3,242,019 3/1966 Gehrig _____149—60 X
3,249,474 5/1966 Clay et al. _____149—44 X
3,282,754 11/1966 Gehrig _____149—46 X
3,288,658 11/1966 Ferguson et al. 149—2 X
3,288,661 11/1966 Swisstack_____ 149—2 X
3,294,601 12/1966 Gordon _____149—60
3,338,165 8/1967 Minnick _____ 149—2 X
3,367,805 2/1968 Clay et al. _____149—44 X
3,376,176 4/1968 Gehrig _____149—46
3,161,551 12/1964 Egly et al._____149—46

BENJAMIN R. PADGETT, *Primary Examiner.*

S. J. LECHERT, *Assistant Examiner.*

U.S. Cl. X.R.

149—21, 43, 44, 46